Tyler Chase **HARPER**, a minor, by and through his parents Ron and Cheryl Harper; Ron Harper; Cheryl Harper, Plaintiffs–Appellants,

v.

**POWAY UNIFIED SCHOOL DISTRICT**; Jeff Mangum; Linda Vanderveen; Penny Ranftyle; Steve McMillan; Andy Patapow, All Individually and in their official capacity as Members of the Board of the Poway Unified School District; Donald A. Phillips, Individually, and in his official capacity as Superintendent of the Poway Unified School District; Scott Fisher, Individually and in his official capacity as Principal of Poway High School; Lynell Antrim, Individually and in her official capacity as Assistant Principal of Poway High School; Ed Giles, Individually and in his official capacity as Vice Principal of Poway High School; David LeMaster, Individually and in his official capacity as Teacher of Poway High School; Does 1 Through 20, Inclusive, Defendants–Appellees.

No. 04–57037.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 2005.
Filed April 20, 2006.
As Amended May 31, 2006.

Robert H. Tyler, Kevin Theriot; Alliance Defense Fund, Murrieta, CA, for the plaintiff-appellant.

Daniel Shinoff, Jack M. Sleeth, Jr., Paul V. Carelli, IV; Stutz, Artiano, Shinoff & Holtz, APC, San Diego, CA, for the defendants-appellees.

Before REINHARDT, KOZINSKI, and THOMAS, Circuit Judges.

REINHARDT, Circuit Judge.

May a public high school prohibit students from wearing T-shirts with messages that condemn and denigrate other students on the basis of their sexual orientation? Appellant in this action is a sophomore at Poway High School who was ordered not to wear a T-shirt to school that

read, "BE ASHAMED, OUR SCHOOL EMBRACED WHAT GOD HAS CONDEMNED" handwritten on the front, and "HOMOSEXUALITY IS SHAMEFUL" handwritten on the back. He appeals the district court's order denying his motion for a preliminary injunction. Because he is not likely to succeed on the merits, we affirm the district court's order.

## I. Factual Background[1]

Poway High School ("the School") has had a history of conflict among its students over issues of sexual orientation. In 2003, the School permitted a student group called the Gay–Straight Alliance to hold a "Day of Silence" at the School which, in the words of an Assistant Principal, is intended to "teach tolerance of others, particularly those of a different sexual orientation."[2] During the days surrounding the 2003 "Day of Silence,"[3] a series of incidents and altercations occurred on the school campus as a result of anti-homosexual comments that were made by students. One such confrontation required the Principal to separate students physically. According to David LeMaster, a teacher at Poway, several students were suspended as a result of these conflicts. Moreover, a week or so after the "Day of Silence," a group of heterosexual students informally organized a "Straight–Pride Day," during which they wore T-shirts which displayed derogatory remarks about homosexuals.

According to Assistant Principal Lynell Antrim, some students were asked to remove the shirts and did so, while others "had an altercation and were suspended for their actions."

Because of these conflicts in 2003, when the Gay–Straight Alliance sought to hold another "Day of Silence" in 2004, the School required the organization to consult with the Principal to "problem solve" and find ways to reduce tensions and potential altercations. On April 21, 2004, the date of the 2004 "Day of Silence," appellant Tyler Chase Harper wore a T-shirt to school on which "I WILL NOT ACCEPT WHAT GOD HAS CONDEMNED," was handwritten on the front and "HOMOSEXUALITY IS SHAMEFUL 'Romans 1:27' " was handwritten on the back. There is no evidence in the record that any school staff saw Harper's T-shirt on that day.

The next day, April 22, 2004, Harper wore the same T-shirt to school, except that the front of the shirt read "BE ASHAMED, OUR SCHOOL EMBRACED WHAT GOD HAS CONDEMNED," while the back retained the same message as before, "HOMOSEXUALITY IS SHAMEFUL 'Romans 1:27.' "[4] LeMaster, Harper's second period teacher, noticed Harper's shirt and observed "several students off-task talking about" the shirt. LeMaster, recalling the altercations that erupted as a result of

---

1. These background facts are based on the limited record before us which includes five declarations by school officials, and declarations from Harper, his father, Ron Harper, and a fellow student, Joel Rhine.

2. In his complaint, Harper alleges that he believes "the true purpose" of the "Day of Silence" was "to endorse, promote and encourage homosexual activity."

3. On the "Day of Silence," participating students wore duct tape over their mouths to symbolize the silencing effect of intolerance

upon gays and lesbians; these students would not speak in class except through a designated representative. Some students wore black T-shirts that said "National Day of Silence" and contained a purple square with a yellow equal sign in the middle. The Gay–Straight Alliance, with the permission of the School, also put up several posters promoting awareness of harassment on the basis of sexual orientation.

4. A copy of a photograph of the T-shirt is attached as Exhibit A.

"anti-homosexual speech" during the previous year's "Day of Silence," explained to Harper that he believed that the shirt was "inflammatory," that it violated the School's dress code, and that it "created a negative and hostile working environment for others." When Harper refused to remove his shirt and asked to speak to an administrator, LeMaster gave him a dress code violation card to take to the front office.

When Harper arrived at the front office, he met Assistant Principal Antrim. She told Harper that the "Day of Silence" was "not about the school promoting homosexuality but rather it was a student activity trying to raise other students' awareness regarding tolerance in their judgement [sic] of others." Antrim believed that Harper's shirt "was inflammatory under the circumstances and could cause disruption in the educational setting." Like LeMaster, she also recalled the altercations that had arisen as a result of anti-homosexual speech one year prior. According to her affidavit, she "discussed [with Harper] ways that he and students of his faith could bring a positive light onto this issue without the condemnation that he displayed on his shirt." Harper was informed that if he removed the shirt he could return to class.

When Harper again refused to remove his shirt, the Principal, Scott Fisher, spoke with him, explaining his concern that the shirt was "inflammatory" and that it was

the School's "intent to avoid physical conflict on campus." Fisher also explained to Harper that it was not healthy for students to be addressed in such a derogatory manner. According to Fisher, Harper informed him that he had already been "confronted by a group of students on campus" and was "involved in a tense verbal conversation" earlier that morning.[5] The Principal eventually decided that Harper could not wear his shirt on campus, a decision that, he asserts, was influenced by "the fact that during the previous year, there was tension on campus surrounding the Day of Silence between certain gay and straight students."[6] Fisher proposed some alternatives to wearing the shirt, all of which Harper turned down. Harper asked two times to be suspended. Fisher "told him that [he] did not want him suspended from school, nor did [he] want him to have something in his disciplinary record because of a stance he felt strongly about." Instead, Fisher told Harper that he would be required to remain in the front office for the remainder of the school day.

Harper spent the rest of the day in the school conference room doing his homework. At some point during that day, Deputy Sheriff Norman Hubbert, who served as the school resource officer for Poway High, came in to speak with Harper.[7] The complaint alleges that Hubbert "came to interrogate" Harper to "determine if he was a dangerous student."

---

5. In his affidavit, Harper characterized these conversations with other students as "peaceful discussions wherein differing viewpoints were communicated."

6. We note that conflicts over homosexuality at Poway High School have not been limited to the incidents surrounding a "Day of Silence." Two former students recently won a suit against the School for failing to protect them from students who harassed them because they are gay. *See* Dana Littlefield, *Two Gay Students Were Harassed, Jury Finds*, San Die-

go Union–Trib., June 9, 2005, at B2. During the trial, one of the students testified that Poway "students repeatedly called him names, shoved him in the hallways, threw food at him and spit on him," and "that he heard other students make disparaging remarks about gays and lesbians on a nearly daily basis." *Id.*

7. Hubbert, who is a detective with the San Diego County Sheriff, was on campus that day because someone, purporting to be a parent, had called the School that morning com-

Hubbert, however, asserts in his affidavit that he and Harper had a "casual conversation concerning the content of the shirt . . . the Bible and [the] scripture reference on the shirt," and that the conversation was conducted "simpl[y out of] curiosity . . . to understand the situation."

Toward the end of the school day, Assistant Principal Ed Giles spoke with Harper. Giles had discovered earlier in the day that Harper attended the same church that he had previously attended, and that he "knew [Harper's] father personally and had attended Biblical studies that [Harper's] father led on Tuesday nights." According to Giles, he went to speak with Harper "out of respect to [Harper] and his family" and "to make sure he was alright." Giles told Harper that he understood "where he was coming from" but wished that he could "express himself in a more positive way." Giles also said that he shared the same Christian faith as Harper, but that as a school employee, he had to watch how he expressed his beliefs and that when he came to work, he had to "leave his faith in [the] car." Giles then asked Harper to "consider other alternatives that would be more positive and non-confrontational," including sponsoring activities through the campus Bible Club.

After his conversation with Giles, Harper remained in the office for the last period of the day, after which he was instructed to proceed directly off campus. Harper was not suspended, no disciplinary record was placed in his file, and he received full attendance credit for the day.

plaining about the School's "condoning" the "Day of Silence" and stated that "he and several other parents had 'had it' and 'would be doing something about it.'" Concerned about safety, Principal Fisher had requested Hubbert's presence on campus on that day.

8. The district court dismissed with prejudice only Harper's due process challenge.

## II. Procedural History

On June 2, 2004, Harper filed a lawsuit in district court against Poway Unified School District and certain named individuals in their individual and official capacities. Harper alleged five federal causes of action—violations of his right to free speech, his right to free exercise of religion, the Establishment Clause, the Equal Protection Clause, and the Due Process Clause—and one state law claim based on California Civil Code § 52.1, which creates a private cause of action for the violation of individual federal and state constitutional rights. On June 22, 2004, the School filed a motion to dismiss, and on July 12, 2004, Harper filed a motion for a preliminary injunction seeking to enjoin the school from "continuing [its] violation of the constitutional rights of Plaintiff Tyler Chase Harper." On November 4, 2004, the district court granted the School's motion to dismiss as to Harper's equal protection, due process,[8] and state law claims, but denied the motion as to his three First Amendment claims: freedom of speech, free exercise of religion, and establishment of religion. The district court also granted the School's motion to dismiss Harper's damages claims against Poway Unified School District and the individual defendants on the ground of qualified immunity. Finally, the district court denied Harper's motion for a preliminary injunction. Harper then filed an interlocutory appeal from the order denying the latter motion.[9]

9. We note that on November 17, 2004, thirteen days after the district court rendered its decision and two days prior to filing his Notice of Appeal with this court, Harper filed a First Amended Verified Complaint adding his sister, Kelsie, who is a freshman at Poway High School, as a plaintiff. On February 23, 2005, the district court granted in part and denied in part the School's motion to dismiss the First Amended Complaint. Because the

### III. Jurisdiction

We have jurisdiction to review the district court's denial of the preliminary injunction motion under 28 U.S.C. § 1292(a)(1).

### IV. Standard and Scope of Review

■■■ For a district court to grant a preliminary injunction, the moving party must demonstrate either "(1) a combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised and the balance of hardships tips in its favor." *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir.2001). "Each of these two formulations requires an examination of both the potential merits of the asserted claims and the harm or hardships faced by the parties." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 965 (9th Cir.2002). "These two alternatives represent extremes of a single continuum, rather than two separate tests." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir.1999) (citation and internal quotation marks omitted). Accordingly, "the greater the relative hardship to the moving party, the less probability of success must be shown." *Id.* (citation and internal quotation marks omitted).

The district court concluded, and the School concedes on appeal, that because Harper's First Amendment claims survived the motion to dismiss, Harper made the necessary showing of irreparable harm. *See Sammartano*, 303 F.3d at 973 (internal quotation marks omitted) ("[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim."). The balance of hardships does not, however, tip in his favor.[10] Therefore, the question is whether Harper demonstrated a likelihood of success on the merits as to any or all of his three First Amendment claims.

■■■ We review a district court's grant or denial of a preliminary injunction for abuse of discretion. *A & M Records, Inc.*, 239 F.3d at 1013. We will reverse "only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003) (citation and internal quotation marks omitted). Where, as here, the appellant does not dispute the district court's factual findings, we are required to determine "whether the court employed the appropriate legal standards governing the issuance of a preliminary injunction and whether the district court correctly apprehended the law with respect to the underlying issues in the case." *A & M Records, Inc.*, 239 F.3d at 1013 (internal quotation and citation omitted). The district court's interpretation of the underlying legal principles is subject to de novo review. *Id.* We may affirm the district court's order "on any ground supported by the record even if it differs from the rationale of the district court." *Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs*, 384 F.3d 1163, 1170 (9th Cir.2004).

---

amended complaint is not before this court on appeal, we limit our review to Harper.

**10.** The district court concluded that "balancing the needs of the School to keep all their students safe coupled with the foreseeable vision that other students may feel free to exhibit these types of expressions that would interfere with the work of the school and violate the rights of others against [Harper's] interests does not tip the scales sharply in [Harper's] favor." As our analysis of *Tinker* below illustrates, not only does the balance of hardships not tip sharply in Harper's favor, but it does not tip in his favor at all.

## V. Analysis

### 1. Freedom of Speech Claim

The district court concluded that Harper failed to demonstrate a likelihood of success on the merits of his claim that the School violated his First Amendment right to free speech because, under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, the evidence in the record was sufficient to permit the school officials to "reasonably ... forecast substantial disruption of or material interference with school activities." 393 U.S. 503, 514, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Harper contends that the district court erred in rejecting his free speech claim on three grounds: (1) his speech is protected under the Supreme Court's holdings in *Tinker* and *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986); (2) the School's actions and policies amount to viewpoint discrimination under *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); and (3) the School's dress code and speech policies are overbroad under *Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).[11] We affirm the district court's denial of the requested preliminary injunction. Although we, like the district court, rely on *Tinker*, we rely on a different provision—that schools may prohibit speech that "intrudes upon ... the rights of other students." *Tinker*, 393 U.S. at 508, 89 S.Ct. 733.

### a. Student Speech Under *Tinker*

Public schools are places where impressionable young persons spend much of their time while growing up. They do so in order to receive what society hopes will be a fair and full education—an education without which they will almost certainly fail in later life, likely sooner rather than

---

**11.** We need not rule upon the validity of the School's dress code or other anti-harassment policies in order to determine whether the district court abused its discretion in denying the preliminary injunction. Harper's motion for a preliminary injunction sought only to enjoin school officials "from continuing their violation of the constitutional rights of Plaintiff Tyler Chase Harper." The only violation alleged was that Harper was precluded from wearing his T-shirt with its demeaning message while at school. The motion did not seek to enjoin the enforcement of the School's dress code or any other school policies against any and all students, but sought only to stop the violation of Harper's purported constitutional right to wear his T-shirt. Our affirmance of the district court order does not depend upon the existence of a valid school policy or code. Under *Tinker*, the School is permitted to prohibit Harper's conduct, with or without a valid anti-harassment or other policy, if it can demonstrate that the restriction was necessary to prevent either the violation of the rights of other students or substantial disruption of school activities. The record is clear that even though Harper's teacher and Vice Principal Antrim stated that the T-shirt violated the dress code, the school officials made plain to Harper that the reason he could not wear the T-shirt was because of its effect upon other students and its disruptive effect upon the educational environment, rather than because it was prohibited by a dress code. The district judge apparently concluded that the validity of the School's anti-harassment policies was not before him, or that it was not necessary to decide that question, and we cannot say that his determination was unreasonable. Finally, we would prefer not to make even a preliminary judgment as to the constitutionality of the School's dress code or anti-harassment policies without the district court first having considered the question. Of course, following remand, the district court may do so at the appropriate time or upon the appropriate motion. In contrast, our dissenting colleague would have us engage on appeal in a sweeping examination *ab initio* of the validity of a complicated series of policies—an examination that would cause us to discuss prematurely a number of controversial constitutional issues. *See* dis. op. at 1201–1207. We see no need for such an exercise of our jurisdiction on this appeal.

later. *See Brown v. Bd. of Educ.*, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("[I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."). The public school, with its free education, is the key to our democracy. *See id.* (stating that public education "is the very foundation of good citizenship"). Almost all young Americans attend public schools.[12] During the time they do—from first grade through twelfth—students are discovering what and who they are. Often, they are insecure. Generally, they are vulnerable to cruel, inhuman, and prejudiced treatment by others.

■ The courts have construed the First Amendment as applied to public schools in a manner that attempts to strike a balance between the free speech rights of students and the special need to maintain a safe, secure and effective learning environment. *See, e.g., Tinker*, 393 U.S. at 507, 89 S.Ct. 733 (balancing the need for "scrupulous protection of Constitutional freedoms of the individual" against the need of schools to perform their proper educational function). This court has expressly recognized the need for such balance: "States have a compelling interest in their educational system, and a balance

must be met between the First Amendment rights of students and preservation of the educational process." *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 988 (9th Cir.2001). Although public school students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker*, 393 U.S. at 506, 89 S.Ct. 733, the Supreme Court has declared that "the First Amendment rights of students in public schools are not automatically coextensive with the rights of adults in other settings, and must be applied in light of the special characteristics of the school environment."[13] *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (internal citation and quotation marks omitted). Thus, while Harper's shirt embodies the very sort of political speech that would be afforded First Amendment protection outside of the public school setting, his rights in the case before us must be determined "in light of [those] special characteristics." *Tinker*, 393 U.S. at 506, 89 S.Ct. 733.

This court has identified "three distinct areas of student speech," each of which is governed by different Supreme Court precedent: (1) vulgar, lewd, obscene, and plainly offensive speech which is governed by *Fraser*,[14] (2) school-sponsored speech which is governed by *Hazelwood*,[15] and (3)

---

**12.** As of the fall of 2005, approximately eighty-eight percent of elementary and secondary students in the United States attended public schools. *See* DIGEST OF EDUCATION STATISTICS, 2004, NAT'L CTR. FOR EDUC. STATISTICS (2004), *available at* http://nces.ed.gov/programs/digest/d04/. Most of the rest attended religious schools. *See* STEPHEN P. BROUGHMAN & KATHLEEN W. PUGH, CHARACTERISTICS OF PRIVATE SCHOOLS IN THE UNITED STATES: RESULTS FROM THE 2001—2002 PRIVATE SCHOOL UNIVERSE SURVEY (U.S. Department of Education, National Center for Education Statistics) (2005).

**13.** Although Harper correctly points out that California law provides greater protection for student speech than federal law, *see* Cal. Educ.Code § 48950(a), he did not raise a state law claim in his preliminary injunction

motion before the district court. Nor did he question, as he does in his brief to us, the constitutionality of the correlative provisions of the California Education Code that provide greater protection than federal law against harassment of students on the basis of sexual orientation. *See* Cal. Educ.Code §§ 200, 201, 220. Accordingly, we do not rely on or resolve any state law questions here.

**14.** Because we decide Harper's free speech claim on the basis of *Tinker*, we need not consider whether his speech was "plainly offensive" under *Fraser*.

**15.** Neither party here claims that Harper's speech is "school-sponsored" and thus governed by *Hazelwood*.

all other speech which is governed by *Tinker*. *Chandler v. McMinnville Sch. Dist.*, 978 F.2d 524, 529 (9th Cir.1992) (internal citations omitted).

In *Tinker*, the Supreme Court confirmed a student's right to free speech in public schools.[16] In balancing that right against the state interest in maintaining an ordered and effective public education system, however, the Court declared that a student's speech rights could be curtailed under two circumstances. First, a school may regulate student speech that would "impinge upon the rights of other students." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733. Second, a school may prohibit student speech that would result in "substantial disruption of or material interference with school activities." *Id.* at 514, 89 S.Ct. 733. Because, as we explain below, the School's prohibition of the wearing of the demeaning T-shirt is constitutionally permissible under the first of the *Tinker* prongs, we conclude that the district court did not abuse its discretion in finding that Harper failed to demonstrate a likelihood of success on the merits of his free speech claim.[17]

#### i. The Rights of Other Students

■ In *Tinker*, the Supreme Court held that public schools may restrict student speech which "intrudes upon ... the rights of other students" or "colli[des] with the rights of other students to be secure and to be let alone." 393 U.S. at 508, 89 S.Ct. 733. Harper argues that *Tinker's* reference to the "rights of ·other students" should be construed narrowly to involve only circumstances in which a student's right to be free from direct physical confrontation is infringed. Drawing on the Fifth Circuit's opinion in *Blackwell v. Issaquena County Bd. of Ed.*, 363 F.2d 749, 751 (5th Cir.1966), which the Supreme Court cited in *Tinker*, Harper contends that because the speakers in *Blackwell* "accosted other students by pinning the buttons on them even though they did not ask for one," a student must be physically accosted in order to have his rights infringed.

Notwithstanding the facts of *Blackwell*, the law does not support Harper's argument. This court has explained that vulgar, lewd, obscene, indecent, and plainly offensive speech "by definition, may well 'impinge[ ] upon the rights of other students,' " even if the speaker does not di-

---

**16.** In *Tinker*, the Supreme Court held that a public school could not ban students from wearing black armbands protesting the Vietnam war where the "silent, passive expression of opinion [was] unaccompanied by any disorder or disturbance," and there was no evidence that the display "colli[ded] with the rights of other students to be secure and to be let alone." 393 U.S. at 508, 89 S.Ct. 733.

**17.** The first part of our colleague's dissent is devoted to a discussion of whether there was sufficient evidence that the wearing of Harper's T-shirt caused substantial disruption, the *Tinker* prong on which the district court relied but which is not relevant to our holding. *See* dis. op. at 1192–1196. The last part of the dissent also deals with a subject we need not and do not address: what the

dissent terms the School's "harassment policy." *Id.* at 1201–1207; *see also supra* n. 11. Oddly, the dissent spends only a relatively minor part of its discussion on the determinative issue here, the impermissible intrusion on the rights of gay and lesbian students. *Id.* at 1197–1201. Even more oddly, in its Conclusion the dissent suggests that speech that is fundamentally offensive to minority students may be constitutionally limited and quarrels only with whether such a limitation is consistent with the wording of *Tinker*. *Id.* at 1207. It also suggests that the Supreme Court might properly modify *Tinker* and validate our holding. *Id.* at 1207. We disagree that any modification of *Tinker* is required or desirable. All that is necessary is a fair reading of its plain language, as we explain in the following section.

rectly accost individual students with his remarks. *Chandler*, 978 F.2d at 529 (quoting *Tinker*, 393 U.S. at 509, 89 S.Ct. 733). So too may other speech capable of causing psychological injury. The Tenth Circuit has held that the "display of the Confederate flag might ... interfere with the rights of other students to be secure and let alone," even though there was no indication that any student was physically accosted with the flag, aside from its general display. *West v. Derby Unified Sch. Dist.*, 206 F.3d 1358, 1366 (10th Cir.2000). While "[t]he precise scope of *Tinker's* 'interference with the rights of others' language is unclear," *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3rd Cir.2001), we unequivocally reject Harper's overly narrow reading of the phrase.

We conclude that Harper's wearing of his T-shirt "colli[des] with the rights of other students" in the most fundamental way. *Tinker*, 393 U.S. at 508, 89 S.Ct. 733. Public school students who may be injured by verbal assaults on the basis of a core identifying characteristic such as race, religion, or sexual orientation, have a right to be free from such attacks while on school campuses. As *Tinker* clearly states, students have the right to "be secure and to be let alone." *Id.* Being secure involves not only freedom from physical assaults but from psychological attacks that cause young people to question their self-worth and their rightful place in society.[18] The "right to be let alone" has been recognized by the Supreme Court, of course, as " 'the most comprehensive of rights and the right most valued by civilized men.' " *Hill v. Colorado*, 530 U.S. 703, 716–17, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)). Indeed, the "recognizable privacy interest in avoiding unwanted communication" is perhaps most important "when persons are 'powerless to avoid' it." *Id.* at 716, 120 S.Ct. 2480 (quoting *Cohen v. California*, 403 U.S. 15, 21–22, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)). Because minors are subject to mandatory attendance requirements, the Court has emphasized "the obvious concern on the part of parents, and school authorities acting *in loco parentis*, to protect children—especially in a captive audience...." *Fraser*, 478 U.S. at 684, 106 S.Ct. 3159. Although name-calling is ordinarily protected outside the school context, "[s]tudents cannot hide behind the First Amendment to protect their 'right' to abuse and intimidate other students at school." *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3rd Cir.2002).

Speech that attacks high school students who are members of minority groups that have historically been oppressed, subjected to verbal and physical abuse, and made to feel inferior, serves to injure and intimidate them, as well as to damage their sense of security and interfere with their opportunity to learn.[19] The demeaning of

---

18. There is nothing in *Tinker* that remotely supports the dissent's contention that the rights to "be secure and to be let alone" are limited to rights such as those that protect against "assault, defamation, invasion of privacy, extortion and blackmail." Dis. op. at 1198. Security and privacy entail far more than freedom from those torts. Nor·does the dissent offer any reason why the rights to security and privacy do not include freedom from verbal assaults that cause psychological injury to young people.

19. California law provides that "[a]ll pupils have the right to participate fully in the educational process, free from discrimination and harassment." Cal. Educ.Code § 201(a). The dissent expostulates on the meaning of the term "harassment" and speculates as to whether the California statute may be contrary to the First Amendment, all of which is irrelevant here because we do not rely on the statute in reaching our decision. *See* dis. op. at 1197 – 1198.

young gay and lesbian students in a school environment is detrimental not only to their psychological health and well-being, but also to their educational development. Indeed, studies demonstrate that "academic underachievement, truancy, and dropout are prevalent among homosexual youth and are the probable consequences of violence and verbal and physical abuse at school." Susanne M. Stronski Huwiler and Gary Remafedi, *Adolescent Homosexuality,* 33 REV. JUR. U.I.P.R. 151, 164 (1999); *see also* Thomas A. Mayes, *Confronting Same–Sex, Student–to–Student Sexual Harassment: Recommendations for Educators and Policy Makers,* 29 FORDHAM URB. L.J. 641, 655 (2001) (describing how gay students are at a greater risk of school failure and dropping out, most likely as a result of "social pressure and isolation"); Amy Lovell, *"Other Students Always Used to Say, 'Look At The Dykes' ": Protecting Students From Peer Sexual Orientation Harassment,* 86 CAL. L.REV. 617, 625–28 (1998) (summarizing the negative effects on gay students of peer sexual orientation harassment). One study has found that among teenage victims of anti-gay discrimination, 75% experienced a decline in academic performance, 39% had truancy problems and 28% dropped out of school. *See* Courtney Weiner, Note, *Sex Education: Recognizing Anti–Gay Harassment as Sex Discrimination Under Title VII and Title IX,* 37 COLUM. HUM. RTS. L.REV. 189, 225 (2005). Another study confirmed that gay students had difficulty concentrating in school and feared for their safety as a result of peer harassment, and that verbal abuse led some gay students to skip school and others to drop out altogether. HUMAN

RIGHTS WATCH, HATRED IN THE HALLWAYS (1999), http://hr w.org/reports/2001/uslgbt/Final–05.-htm# P609_91364. Indeed, gay teens suffer a school dropout rate over three times the national average. NAT'L MENTAL HEALTH ASS'N, BULLYING IN SCHOOLS: HARASSMENT PUTS GAY YOUTH AT RISK, http://www.nmha.org/pbedu/backtoschool/bullyingGayYouth.pdf; *see also* Maurice R. Dyson, *Safe Rules or Gays' Schools? The Dilemma of Sexual Orientation Segregation in Public Education,* 7 U. PA. J. CONST. L. 183, 187 (2004) (gay teens face greater risks of "dropping out [and] performing poorly in school"); Kelli Armstrong, *The Silent Minority Within a Minority: Focusing on the Needs of Gay Youth in Our Public Schools,* 24 GOLDEN GATE U. L.REV. 67, 76–77 (1994) (describing how abuse by peers causes gay youth to experience social isolation and drop out of school). In short, it is well established that attacks on students on the basis of their sexual orientation are harmful not only to the students' health and welfare, but also to their educational performance and their ultimate potential for success in life.

Those who administer our public educational institutions need not tolerate verbal assaults that may destroy the self-esteem of our most vulnerable teenagers and interfere with their educational development.[20] *See Muller by Muller v. Jefferson Lighthouse Sch.,* 98 F.3d 1530, 1540 (7th Cir.1996) (stating that elementary schools may restrict speech "that could crush a child's sense of self-worth"); *Saxe,* 240 F.3d at 217 (observing that speech that "substantially interfer[es] with a student's educational performance" may satisfy the *Tinker* standard).[21] To the con-

---

**20.** In fact, California schools like Poway High are required by law "to minimize and eliminate a hostile environment on school grounds that impairs the access of pupils to equal educational opportunity." Cal. Educ.Code § 201(f).

**21.** *Saxe* considered the validity of a school district's anti-harassment policy, a question we do not address here. *See supra* n. 11. Although in its discussion of a provision regarding "hostile environment," *Saxe* briefly alludes to the "interference with the rights of

trary, the School had a valid and lawful basis for restricting Harper's wearing of his T-shirt on the ground that his conduct was injurious to gay and lesbian students and interfered with their right to learn.[22]

The dissent claims that we should not take notice of the fact that gay students are harmed by derogatory messages such as Harper's because there is no "evidence" that they are in fact injured by being shamed or humiliated by their peers. *See* dis. op. at 1198–1199. It is simply not a novel concept, however, that such attacks on young minority students can be harmful to their self-esteem and to their ability to learn. As long ago as in *Brown v. Board of Education,* the Supreme Court recognized that "[a] sense of inferiority affects the motivation of a child to learn." 347 U.S. at 494, 74 S.Ct. 686 (internal quotation marks omitted). If a school permitted its students to wear shirts reading,

"Negroes: Go Back To Africa," no one would doubt that the message would be harmful to young black students. So, too, in the case of gay students, with regard to messages such as those written on Harper's T-shirt.[23] As our dissenting colleague recently concluded, "[y]ou don't need an expert witness to figure out" the self-evident effect of certain policies or messages. *Jespersen v. Harrah's Operating Co., Inc.,* 444 F.3d 1104, 1117, at *13 (9th Cir.2006) (Kozinski, Circuit Judge, dissenting). Just as Judge Kozinski found it to be "perfectly clear"—*without the aid of any evidence in the record*—that an employer's makeup requirement burdened women, the fact that Harper's demeaning statement is harmful to gay students at Poway High "hardly seem[s] like [a] question[ ] reasonably subject to dispute." *Id.* at *12, 1117. One would think that if we should be able to take notice of how long it takes women to put on makeup, or that

---

others" prong of *Tinker,* it appears to conflate that prong with the "substantial disruption" prong and to suggest, perhaps inadvertently, that injurious slurs may not be prohibited unless they also cause substantial disruption. *See Saxe,* 240 F.3d at 217. That clearly is not the case. The two *Tinker* prongs are stated in the alternative. *See Tinker,* 393 U.S. at 508, 89 S.Ct. 733. We agree, however, with *Saxe's* conclusion that "it is certainly not enough that the speech is merely offensive to some listener." *Saxe,* 240 F.3d at 217.

22. As noted *supra,* California law explicitly recognizes the right of students to be free from harassment on the basis of sexual orientation. *See* Cal. Educ.Code § 200, 201. These provisions were enacted not in a vacuum, but out of a recognition on the part of the state legislature of "an urgent need to prevent and respond to acts of hate violence and bias-related incidents that are occurring at an increasing rate in California's public schools." *Id.* at § 201(d). We also observe that federal law provides public school students some protection against harassment and discriminatory treatment based on sexual orientation. For example, in *Flores v. Morgan Hill Unified*

*Sch. Dist.,* 324 F.3d 1130, 1134–35 (9th Cir. 2003), we held that the Equal Protection Clause protects against school districts' indifference to certain kinds of negative speech aimed at gay students. *See also* Mayes, *supra,* at 643 (observing that harassment based on sexual orientation may be actionable under Title IX as harassment based on sex).

23. There is much literature to this effect. *See supra* pp. 1178–1179. Our dissenting colleague's notion of "evidence" appears to be rather odd. It seems to consist largely of motion pictures and television shows. The dissent draws conclusions that it is "not unusual in a high school classroom for students to be 'off-task' " and that politics and other subjects "are the ordinary subjects of discourse in high school corridors" on the basis of our colleague's viewing of a number of popular entertainment features. *See* dis. op. at 1194 n. 2 & 1194 n. 3. Perhaps he would prefer us to cite *Brokeback Mountain* (Paramount Pictures 2005) or *The Matthew Shepard Story* (2002), as evidence of the harmful effects of anti-gay harassment rather than simply stating that which, to anyone familiar with or in any way sensitive to, the history or effect of discrimination, is a self-evident fact.

makeup is an expensive item, we can certainly take notice that it is harmful to gay teenagers to be publicly degraded and called immoral and shameful.[24] Certainly, the California legislature had no difficulty in determining that harassment on the basis of sexual orientation adversely affects the rights of public high school students. *See* Cal. Educ.Code § 201(c).[25]

The dissent takes comfort in the fact that there is a political disagreement regarding homosexuality in this country. *See* dis. op. at 1197. We do not deny that there is, just as there was a longstanding political disagreement about racial equality that reached its peak in the 1950's and about whether religious minorities should hold high office that lasted at least until after the 1960 presidential election,[26] or whether blacks or Jews should be permitted to attend private universities and prep schools, work in various industries such as banks, brokerage houses, and Wall Street law firms, or stay at prominent resorts or hotels. Such disagreements may justify social or political debate, but they do not justify students in high schools or elementary schools assaulting their fellow students with demeaning statements: by calling gay students shameful, by labeling black students inferior or by wearing T-shirts saying that Jews are doomed to

Hell. Perhaps our dissenting colleague believes that one can condemn homosexuality without condemning homosexuals. If so, he is wrong. To say that homosexuality is shameful is to say, necessarily, that gays and lesbians are shameful. There are numerous locations and opportunities available to those who wish to advance such an argument. It is not necessary to do so by directly condemning, to their faces, young students trying to obtain a fair and full education in our public schools.

Our dissenting colleague also appears to believe that the fact that Harper wore his T-shirt in response to a "Day of Silence" somehow lessens the injurious effect of his act because by participating in the gay rights event, gay students "perforce acknowledge that their status is not universally admired or respected." Dis. op. at 1200. This argument is completely without merit. The fact that gays, or for that matter blacks, Jews, or Latinos, recognize that they are the subject of prejudice and are not "respected" or considered equal by some in certain public schools in this country does not mean that they are not injured when the usually unspoken prejudice turns into harmful verbal conduct. Moreover, the dissent's assertion that gay students may prefer to see the demeaning

**24.** We should point out that we are considering here whether to reverse a denial of a preliminary injunction. The extent to which a self-evident proposition must be established in order to avoid such a reversal under an abuse of discretion standard is not necessarily the same as may be required at a trial on the merits, although we express no view on the latter question.

**25.** Although we do not rely on the California statute to support our holding, we note that the Legislature, in the California Schools Hate Violence Reduction Act of 1995, declared: "Harassment on school grounds directed at an individual on the basis of personal characteristics or status creates a hostile environment and *jeopardizes equal education-*

*al opportunity* as guaranteed by the California Constitution and the United States Constitution." Cal. Educ.Code. § 201(c) (emphasis added).

**26.** For example, in the late 19th century, James G. Blaine ran for President in a campaign that is remembered for its slogan of "Rum, Romanism and Rebellion." *See* Richard G. Bacon, *Rum, Romanism and Romer*, 6 Del. L.Rev. 1, 39–40 (2003); *see also* Joseph P. Viteritti, *Davey's Plea: Blaine, Blair, Witters, and the Protection of Religious Freedom*, 27 Harv. J.L. & Pub. Pol'y 299, 311 (2003) (citation omitted) (observing that Blaine's campaign for the Republican nomination "was built around his (and the party's) opposition to 'Rum, Romanism, and Rebellion.'").

statements contained on Harper's T-shirt rather than on bathroom walls makes even less sense. *See id.* The First Amendment does not justify students launching such injurious and harmful personal attacks in either location.

What we hold in this opinion is a far cry from what the dissent suggests. We do not hold that schools may "define civic responsibility and then ban opposing points of view." *Id.* at 1196 n. 7. The question of what types of assemblies schools should or may conduct regarding controversial public issues or what types of speech students may otherwise generally engage in regarding such issues is not before us. Different circumstances require different results. We consider here only whether schools may prohibit the wearing of T-shirts on high school campuses and in high school classes that flaunt demeaning slogans, phrases or aphorisms relating to a core characteristic of particularly vulnerable students and that may cause them significant injury. We do not believe that the schools are forbidden to regulate such conduct. Nor, contrary to the dissent, do we believe that because a school sponsors or permits a "Day of Tolerance" or a "Day of Silence" minority students should be required to publicly "[c]onfront[ ]" and "refut[e]" demeaning verbal assaults on them—that they may be left with no option other than to try to justify their sexual practices to the entire student body or explain to all their fellow students why they are not inferior or evil. *Id.* at 1200. The First Amendment does not require that young students be subjected to such a destructive and humiliating experience.

In his declaration in the district court, the school principal justified his actions on the basis that "any shirt which is worn on campus which speaks in a derogatory manner towards an individual or group of individuals is not healthy for young people...." If, by this, the principal meant that all such shirts may be banned under *Tinker*, we do not agree. T-shirts proclaiming, "Young Republicans Suck," or "Young Democrats Suck," for example, may not be very civil but they would certainly not be sufficiently damaging to the individual or the educational process to warrant a limitation on the wearer's First Amendment rights. Similarly, T-shirts that denigrate the President, his administration, or his policies, or otherwise invite political disagreement or debate, including debates over the war in Iraq, would not fall within the "rights of others" *Tinker* prong.[27]

 Although we hold that the School's restriction of Harper's right to carry messages on his T-shirt was permissible under *Tinker*, we reaffirm the importance of preserving student speech about controversial issues generally and protecting the bedrock principle that students "may not be confined to the expression of those sentiments that are officially approved." *Tinker*, 393 U.S. at 511, 89 S.Ct. 733; *see also Fraser*, 478 U.S. at 681, 106 S.Ct. 3159 (noting students' "freedom to advocate unpopular and controversial views in schools and classrooms"). It is essential that students have the opportunity to engage in full and open political expression, both in and out of the school environment. Engaging in controversial

27. The dissent suggests that our decision might somehow allow a school to restrict student T-shirts that voice strongly-worded opposition to the war in Iraq. *See* dis. op. at 1197. That is not so. Our colleague ignores the fact that our holding is limited to injurious speech that strikes at a core identifying characteristic of students on the basis of their membership in a minority group. The anti-war T-shirts posited by the dissent constitute neither an attack on the basis of a student's core identifying characteristic nor on the basis of his minority status.

political speech, even when it is offensive to others, is an important right of all Americans and learning the value of such freedoms is an essential part of a public school education. Indeed, the inculcation of "the fundamental values necessary to the maintenance of a democratic political system" is "truly the 'work of the schools.'" *Fraser*, 478 U.S. at 683, 106 S.Ct. 3159 (quoting *Tinker*, 393 U.S. at 508, 89 S.Ct. 733). Limitations on student speech must be narrow, and applied with sensitivity and for reasons that are consistent with the fundamental First Amendment mandate. Accordingly, we limit our holding to instances of derogatory and injurious remarks directed at students' minority status such as race, religion, and sexual orientation.[28] Moreover, our decision is based not only on the type and degree of injury the speech involved causes to impressionable young people, but on the locale in which it takes place. *See Tinker*, 393 U.S. at 506, 89 S.Ct. 733 (student rights must be construed "in light of the special characteristics of the school environment"). Thus, it is limited to conduct that occurs in public high schools (and in elementary schools). As young students acquire more strength and maturity, and specifically as they reach college age, they become adequately equipped emotionally and intellectually to deal with the type of verbal assaults that may be prohibited during their earlier years. Accordingly, we do not condone the use in public colleges or other public institutions of higher learning of restrictions similar to those permitted here.

Finally, we emphasize that the School's actions here were no more than necessary to prevent the intrusion on the rights of other students. Aside from prohibiting the wearing of the shirt, the School did not take the additional step of punishing the speaker: Harper was not suspended from school nor was the incident made a part of his disciplinary record.

Under the circumstances present here, we conclude that the School's actions did not extend beyond the scope of the restrictions permitted by *Tinker*, and that the district court did not abuse its discretion in finding that Harper failed to demonstrate a likelihood of success on the merits of his free speech claim.

### ii. Substantial Disruption

The district court concluded that Harper had failed to demonstrate a likelihood of success on the merits of his free speech claim because there was sufficient evidence to permit the school officials to "reasonably ... forecast substantial disruption of

---

**28.** We do not consider here whether remarks based on gender warrant similar treatment, preferring to leave that question to another time. We recognize, however, that problems of gender discrimination remain serious and that they exist throughout learning institutions, from the public and religious schools to institutions of higher learning, not excluding the most prominent institutions in the nation.

Our dissenting colleague worries that offensive words directed at majority groups such as Christians or whites will not be covered by our holding. *See* dis. op. at 1201. There is, of course, a difference between a historically oppressed minority group that has been the victim of serious prejudice and discrimination and a group that has always enjoyed a preferred social, economic and political status.

Growing up as a member of a minority group often carries with it psychological and emotional burdens not incurred by members of the majority. In any event, any verbal assault targeting majorities that might justify some form of action by school officials is more likely to fall under the "substantial disruption" prong of *Tinker* or under the *Fraser* rule permitting schools to prohibit "plainly offensive" speech. 478 U.S. at 683, 106 S.Ct. 3159; *cf. Frederick v. Morse*, 439 F.3d 1114, 1122 n. 44 (9th Cir.2006) (observing that *Fraser* "only enables schools to prevent the sort of vulgar, obscene, lewd or sexual speech that, specially with adolescents, readily promotes disruption"). We do not exclude, however, the possibility that some verbal assaults on the core characteristics of majority high

or material interference with school activities." *Tinker*, 393 U.S. at 514, 89 S.Ct. 733. In so holding, the district court relied on the declarations of Principal Fisher, Assistant Principal Antrim, and LeMaster which described how the previous year's "Day of Silence" had resulted in "volatile behavior" and "tensions between students," including physical altercations. The court also cited LeMaster's testimony that he had observed disruption in the class that Harper attended while wearing the T-shirt, and Principal Fisher's testimony that Harper told him that a "tense verbal conversation with a group of students" had already taken place due to the T-shirt's message.

In light of our conclusion regarding the application of the "rights of others" prong of *Tinker*, we have no cause to decide whether the evidence would be sufficient to warrant denial of a preliminary injunction under the "substantial disruption" prong as well.[29]

### b. Viewpoint Discrimination

 In reaching our decision that Harper may lawfully be prohibited from wearing his T-shirt, we reject his argument that the School's action constituted impermissible viewpoint discrimination. The government is generally prohibited from regulating speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510. However, as the district court correctly pointed out, speech in the public schools is not always governed by the same rules that apply in other circumstances. *See Hazelwood*, 484 U.S. at 266, 108 S.Ct. 562; *Fraser*, 478 U.S. at 685, 106 S.Ct. 3159; *West*, 206 F.3d at 1366 (schools may ban student speech that "could well be considered a form of political speech to be afforded First Amendment protection outside the educational setting"). Indeed, the Court in *Tinker* held that a school may prohibit student speech, even if the consequence is viewpoint discrimination, if the speech violates the rights of other students or is materially disruptive. *See Tinker*, 393 U.S. at 511, 89 S.Ct. 733 (stating school cannot prohibit "expression of one particular opinion" unless it makes a specific showing of consti-

school students would merit application of the *Tinker* "intrusion upon the rights of other students" prong. That question is not presently before us.

**29.** Our recent decision in *Frederick v. Morse*, 439 F.3d 1114 (9th Cir.2006), is in no respect inconsistent with this opinion. In *Frederick*, we held that a public high school's suspension of a student for displaying off campus, during the running of the Winter Olympics Torch Relay, a banner that read "Bong Hits 4 Jesus," violated *Tinker*. *Frederick* differs from the present case in four fundamental ways. First and foremost, *Frederick* did not address the "intrudes upon the rights of others" prong of *Tinker*, the ground upon which we base our holding here. Rather, the only issue in *Frederick* was whether the other *Tinker* prong— "substantial disruption"—was applicable. Second, in *Frederick* we concluded that the school's actions did not meet the "substantial disruption" prong because the school officials conceded that they punished the student's display of the banner *not* out of "concern that it would cause disruption" but because "the speech promotes a social message contrary to the one favored by the school." *Id.* at 1117–18. Here, although in view of our holding, we need not (and do not) consider the "substantial disruption" prong of *Tinker*, the School presented evidence that it restricted Harper's wearing of the T-shirt because it expected that his doing so would cause substantial disruption. Third, *Frederick* involved punishing student speech that took place "outside the classroom, across the street from the school, during a non-curricular activity that was only partially supervised by school officials." *Id.* at 1123. By contrast, Harper wore the offending T-shirt not only on campus, but inside the classroom. Finally, in the case before us, the School adopted the least restrictive means of curing the injury; it simply forbade the wearing of the garment. In *Frederick*, in contrast, the school authorities punished the student harshly for the purported (but non-existent) offense by suspending him for ten days. *Id.* at 1116.

tutionally valid reasons); *see also Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 (5th Cir.2004) (stating that *Tinker* "applies to school regulations directed at specific student viewpoints"); *Muller by Muller*, 98 F.3d at 1538 (emphasis added) (observing difference between suppressing religious speech "solely because it is religious" and suppressing speech that is "religious *and* disruptive or hurtful"). Thus, pursuant to *Tinker*, courts have allowed schools to ban the display of Confederate flags despite the fact that such a ban may constitute viewpoint discrimination. *See Scott*, 324 F.3d at 1248 (upholding ban on Confederate flag where school officials presented evidence of racial tensions at the school); *West*, 206 F.3d at 1366 (same). While the Confederate flag may express a particular viewpoint, "[i]t is not only constitutionally allowable for school officials" to limit the expression of racially explosive views, "it is their duty to do so." *Scott*, 324 F.3d at 1249. Because, as we have already explained, the record demonstrates that Harper's speech intruded upon the rights of other students, the School's restriction is permissible under *Tinker*, and we must reject Harper's viewpoint discrimination claim.[30]

▮ The dissent claims that although the School may have been justified in banning discussion of the subject of sexual orientation altogether, it cannot "gag[] only those who oppose the Day of Silence." Dis. op. at 1197. As we have explained, however, although *Tinker* does not allow schools to restrict the non-invasive, non-disruptive expression of political viewpoints, it does permit school authorities to restrict "one particular opinion" if the expression would "impinge upon the rights of other students" or substantially disrupt school activities. *Tinker*, 393 U.S. at 509, 511, 89 S.Ct. 733. Accordingly, a school may permit students to discuss a particular subject without being required to allow them to launch injurious verbal assaults that intrude upon the rights of other students.

▮ "A school need not tolerate student speech that is inconsistent with its basic educational mission, [ ] even though the government could not censor similar speech outside the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (citation and internal quotation marks omitted). Part of a school's "basic educational mission" is the inculcation of "fundamental values of habits and manners of civility essential to a democratic society." *Fraser*, 478 U.S. at 681, 106 S.Ct. 3159 (internal quotation marks omitted). For this reason, public schools may permit, and even encourage, discussions of tolerance, equality and democracy without being required to provide equal time for student or other speech espousing intolerance, bigotry or hatred. As we have explained, *supra* pp. 1182 – 1183, because a school sponsors a "Day of Religious Tolerance," it need not permit its students to wear T-shirts reading, "Jews Are Christ–Killers" or "All Muslims Are Evil Doers." Such expressions would be "wholly inconsistent with the 'fundamental values' of public school education." *Id.* at 685–86, 106 S.Ct. 3159. Similarly, a school that permits a "Day of

---

30. The cases on which Harper relies to support his viewpoint discrimination claim involve the entirely different question whether schools may deny student groups access to school resources on the basis of their religious viewpoint. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 386–87, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (school allowed use of school facilities for private groups, but prohibited "meetings for religious purposes"); *Prince v. Jacoby*, 303 F.3d 1074, 1090 (9th Cir.2002) (school allowed student clubs access to school facilities but excluded student Bible club). Those cases are not relevant here.

Racial Tolerance," may restrict a student from displaying a swastika or a Confederate Flag. *See West,* 206 F.3d at 1365–66. In sum, a school has the right to teach civic responsibility and tolerance as part of its basic educational mission; it need not as a quid pro quo permit hateful and injurious speech that runs counter to that mission.[31]

We again emphasize that we do not suggest that all debate as to issues relating to tolerance or equality may be prohibited. As we have stated repeatedly, we consider here only the question of T-shirts, banners, and other similar items bearing slogans that injure students with respect to their core characteristics. Other issues must await another day.

## 2. Free Exercise of Religion Claim

Harper also contends that the district court erred because he was entitled to a preliminary injunction as a result of the School's violation of his rights under the Free Exercise Clause. He asserts that his wearing of the T-shirt was "motivated by sincerely held religious beliefs" regarding homosexuality[32] and that the School "punished" him for expressing them, or otherwise burdened the exercise of those views. Additionally, Harper argues that the School "attempted to change" his religious views and that this effort violated both the Free Exercise Clause and the Establishment Clause.

The Free Exercise Clause of the First Amendment provides that Congress shall make no law "prohibiting the free exercise" of religion. U.S. Const. amend. I. The Clause prohibits the government from "compel[ling] affirmation of religious belief, punish[ing] the expression of religious doctrines it believes to be false, impos[ing] special disabilities on the basis of religious views or religious status, or lend[ing] its power to one or the other side in controversies over religious authority or dogma." *Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (internal quotation marks and citations omitted).

In *Sherbert v. Verner,* the Supreme Court held that governmental actions that substantially burden a religious belief or practice must be justified by a compelling state interest and must be narrowly tailored to serve that interest. 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The *Sherbert* test was later largely discarded in *Smith,* which held that the "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (citation omitted). The Court held that a neutral law of general applicability need not be supported by a compelling governmental interest even though it has the incidental effect of burdening religion. *See id.* at 885, 110 S.Ct. 1595; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 531,

---

**31.** We note, incidentally, that the incident in question occurred on the day after the "Day of Silence," and not on the day itself.

**32.** We do not, of course, consider whether Harper's views are consistent with his religion, nor do we ask whether his religion truly encourages homophobic conduct. Similarly, we do not consider whether the isolated excerpt from the New Testament, *Romans 1:27,* is representative of Christian doctrine generally. All such inquiries are beyond the judiciary's authority. *See Hernandez v. C.I.R.,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.")

113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).[33] The Court noted, however, that a "hybrid claim," *i.e.*, a claim that involves "not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech," merits application of strict scrutiny: the law or action must be narrowly tailored to advance a compelling government interest. *Smith*, 494 U.S. at 881, 110 S.Ct. 1595; *see also Miller v. Reed*, 176 F.3d 1202, 1207 (9th Cir.1999) (same). Although it did not say so expressly, in *Smith* the Court preserved the *Sherbert* test for use in hybrid-rights cases. In order, however, "to assert a hybrid-rights claim, a free exercise plaintiff must make out a colorable claim that a companion right has been violated—that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *Miller*, 176 F.3d at 1207 (internal citation and quotation marks omitted).

Harper does not contend that the School's prohibition against his wearing his T-shirt was motivated by other than secular reasons or that it was applied to him because of his religious views. Nor is there anything in the record to suggest that other students wearing T-shirts similarly demeaning of gay and lesbian members of the student body would be treated differently, Christians or not.[34] Under *Smith*, Harper's claim would surely fail. Harper asserts, however, that we should apply *Sherbert's* strict scrutiny test to his free exercise claim because his is a "hybrid" claim involving the Free Exercise Clause in conjunction with other constitutional claims.[35] The School disagrees, arguing that the district court properly applied rational basis review under *Smith* because its prohibition of Harper's speech involved a "valid and neutral [rule] of general applicability."[36] *Smith*, 494 U.S. at 879, 110 S.Ct. 1595.

We seriously doubt that there is "a fair probability or a likelihood" that Harper's claim that a companion right—free speech—has been violated will succeed on the merits, as required by *Miller*. 176 F.3d at 1207 (internal quotation marks omitted).[37] In fact, we are fairly confident that it will not, for the reasons we have

---

**33.** "A law is one of neutrality and general applicability if it does not aim to 'infringe upon or restrict practices because of their religious motivation,' and if it does not 'in a selective manner impose burdens only on conduct motivated by religious belief[.]' " *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir.2004) (quoting *Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217).

**34.** Harper does not argue that the School's ban on his wearing the injurious and demeaning T-shirt was arbitrary or capricious, only that it violated the First Amendment rights discussed herein.

**35.** Although Harper refers to "other constitutional claims" and even "numerous constitutional claims," the only claim that has the potential to justify his invoking of "hybrid" status is the free speech claim.

**36.** The district court determined that, "without the free speech claim, plaintiff's free exer-

cise claim does not require strict scrutiny." It then ignored the free speech claim, apparently because it had already found that it was unlikely to succeed. Applying rational basis review, the court concluded that the School's action was rationally based on a legitimate pedagogical concern, and that Harper failed to demonstrate that it was irrational or wholly arbitrary.

**37.** We note that the School conceded in essence that the free speech claim was "colorable" for purposes of Harper's establishing "irreparable harm"—one of the factors that may in combination with others justify issuance of a preliminary injunction. *See supra* pp. 1173 – 1174. We need not consider, however, whether "colorable" has different meanings for purposes of irreparable harm under *Sammartano*, and for purposes of a hybrid claim under *Miller*, as we assume here that Harper's free speech claim *is* colorable for the latter purpose as well.

explained *supra* Part V.1. Nevertheless, we need not decide whether Harper's free exercise claim is properly deemed a "hybrid" claim, because, whether or not *Sherbert's* strict scrutiny test applies, Harper cannot prevail here. "Under the *Sherbert* test, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest."[38] *Smith,* 494 U.S. at 883, 110 S.Ct. 1595. In this case, Harper flunks the test in every respect.

Assuming that *Sherbert* applies, we must first consider whether the School's actions "substantially burden" a religious practice or belief. The record simply does not demonstrate that the School's restriction regarding Harper's T-shirt imposed a substantial burden upon the free exercise of Harper's religious beliefs. There is no evidence that the School "compell[ed] affirmation of a repugnant belief," "penalize[d] or discriminate[d] against [Harper] because [he] hold[s] religious views abhorrent to the authorities," or "condition[ed] the availability of benefits upon [Harper's] willingness to violate a cardinal principle of [his] religious faith." *Sherbert,* 374 U.S. at 402, 406, 83 S.Ct. 1790. Nor did the School "lend its power to one or the other side in controversies over religious authority or dogma," or "punish the expression of religious doctrines it believes to be false." *Smith,* 494 U.S. at 877, 110 S.Ct. 1595.

Despite Harper's allegation that the School "punished" him for expressing his religious views, the record demonstrates the contrary: the School did not punish Harper at all. It simply prohibited him from wearing the offensive and disruptive shirt and required him to refrain from attending class for a portion of a day, if he insisted on continuing to wear it. Nor did the restriction imposed on Harper's wearing of the T-shirt constitute a substantial limitation on his right to express his religious views. No one has the right to proclaim his views at all times in all manners in all places, regardless of the circumstances, and Harper does not contend that his religion suggests otherwise. Harper remains free to express his views, whatever their merits, on other occasions and in other places. The prohibition against the wearing of a T-shirt in school does not constitute a substantial burden on the exercise of his religious beliefs.

 Even if a religious creed, or an individual's interpretation of that creed, could be said to require its adherents to proclaim their religious views at all times and in all places, and to do so in a manner that interferes with the rights of others, the First Amendment would not prohibit the state from banning such disruptive conduct in certain circumstances, including on a high school campus. The Constitution does not authorize one group of persons to force its religious views on others or to compel others to abide by its precepts. Nor does it authorize individuals to engage in conduct, including speech, on the grounds of public schools, that is harmful to other students seeking to obtain a fair and equal education—even if those individuals hold a sincere belief that the principles of their religion require them to discriminate against others, or to publicly proclaim their discriminatory views whenever they believe that "evil" practices are being condoned. *See Sherbert,* 374 U.S. at 403, 83 S.Ct. 1790 (internal quotation marks omitted) ("[E]ven when the action is in accord with one's religious convictions, it

---

**38.** We have described the *Sherbert* test as requiring the weighing of three factors: (1) how much the state action interferes with the exercise of religious beliefs; (2) whether there is a compelling state interest justifying a burden on religious beliefs; and (3) whether accommodating those beliefs would unduly interfere with the fulfillment of the government interest. *N.L.R.B. v. Hanna Boys Center,* 940 F.2d 1295, 1305 (9th Cir.1991).

is not totally free from legislative restrictions."). Schools may prohibit students and others from disrupting the educational process or causing physical or psychological injury to young people entrusted to their care, whatever the motivations or beliefs of those engaged in such conduct. Indeed, the state's interest in doing so is compelling.

Because there is no evidence that the School's restriction on Harper's wearing of his T-shirt substantially burdened a religious practice or belief, and because the School has a compelling interest in providing a proper educational environment for its students and because its actions were narrowly tailored to achieve that end,[39] it would appear that the district court did not abuse its discretion in finding that Harper failed to demonstrate a likelihood of success on the merits as to his free exercise of religion claim. Before reaching that conclusion, however, we must deal with one final argument that Harper raises as a part of that claim. Harper asserts that the School "attempted to change" his religious views that "homosexuality is harmful to both those who practice it and the community at large." Specifically, Harper alleges that the school officials' comments that his shirt was "inflammatory," Detective Hubbert's questioning of him, and Assistant Principal Giles' statement that he leaves his Christian faith in the car when he comes to school, all were attempts by school authorities to change his religious views.

The district court rejected Harper's contention. Indeed, there is no evidence in the record that the school representatives sought to change Harper's religious beliefs. Harper's complaint avers that Detective Hubbert "proposed to [Harper] that as a member of the Christian faith, he should understand that Christianity was based on love not hate, and that [he] should not be offensive to others." Hubbert's homily did not constitute an attempt to change Harper's religious views, simply his offensive behavior; at most, it was, as the district court concluded, an "option[ ] presented to and left with" Harper. The statements that the message on Harper's shirt was "inflammatory" and would be harmful to the educational environment were merely statements of fact that represented the School's informed judgment. More important, like Hubbert's statement, they were designed to affect Harper's behavior not his beliefs. As for Giles' comments, his affidavit stated that he did not tell Harper to "leave his own faith in the car," but explained that, as a school employee, he, Giles, had to leave *his own* Christian faith in the car when he came to work. While Giles' statement might also be construed as an attempt to encourage Harper to change his conduct—to refrain, while on campus, from expressing religious views that denigrate others—it cannot be characterized as an attempt to change his views. In fact, rather than tell Harper to change his beliefs, Giles encouraged him to join the campus Bible Club so that he could become part of an "activity that would express his [Christian] opinions in a positive way on campus," an activity that was wholly consistent with Harper's religious views. The record thus does not support Harper's claim that the School violated his free exercise right by "attempting to change" his religious views.

▬ Moreover, school officials' statements and any other school activity intended to teach Harper the virtues of tolerance constitute a proper exercise of a

---

**39.** As discussed earlier, the School did no more than necessary to further its compelling interest in protecting the rights of students and maintaining a healthy learning environment. It merely prohibited Harper from wearing the T-shirt at school, and did not even take the additional step of suspending or otherwise punishing him.

school's educational function, even if the message conflicts with the views of a particular religion. A public school's teaching of secular democratic values does not constitute an unconstitutional attempt to influence students' religious beliefs. Rather, it simply reflects the public school's performance of its duty to educate children regarding appropriate secular subjects in an appropriate secular manner. As we have reiterated earlier, "the inculcation of fundamental values necessary to the maintenance of a democratic political system" is "truly the 'work of the schools.'" *Fraser*, 478 U.S. at 681, 683, 106 S.Ct. 3159 (quoting *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979); quoting *Tinker*, 393 U.S. at 508, 89 S.Ct. 733). Public schools are not limited to teaching materials that are consistent with all aspects of the views of all religions. So long as the subject and materials are appropriate from an educational standpoint and the purpose of the instruction is secular, the school's teaching is not subject to a constitutional objection that it conflicts with a view held by members of a particular religion. There is no evidence here that the school officials' comments were associated with a religious, as opposed to a secular, purpose. Their affidavits demonstrate that the School acted in order to maintain a secure and healthy learning environment for all its students, not to advance religion.

 The Constitution does not preclude school districts from teaching the essential elements of democracy or otherwise performing their proper educational mission simply because some individuals or groups may assert that their religious views are inconsistent with the lessons taught as a part of that mission. Accordingly, we affirm the district court's decision that Harper was not entitled to a preliminary injunction on the basis of his free exercise claim.

### 3. Establishment Clause Claim

 Finally, we consider the district court's conclusion that Harper did not demonstrate a likelihood of success on the merits of his claim that the School violated the Establishment Clause by attempting to "coerce" him into changing his religious beliefs that "homosexuality is harmful to both those who practice it and the community at large."

Harper's Establishment Clause claim as presented on appeal appears to be simply a restatement of his Free Exercise claim. In fact, as the Supreme Court has noted, its Establishment Clause cases "for the most part have addressed governmental efforts to *benefit* religion or particular religions," and thus allegations of an "attempt to *disfavor*" a religion, such as Harper's, are properly analyzed under the Free Exercise Clause. *Lukumi*, 508 U.S. at 532, 113 S.Ct. 2217 (emphasis added). However, in the interest of thoroughness, we briefly address Harper's claim of "coercion" under the Establishment Clause.

Harper bases his claim almost entirely on the Supreme Court's statement in *Lee v. Weisman*, that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'"[40] 505 U.S. 577, 587, 112 S.Ct. 2649,

---

**40.** The only other case upon which Harper relies for his coercion claim is *Peloza v. Capistrano Unified Sch. Dist.*, in which this court observed that "[t]o permit [a teacher] to discuss his religious beliefs with students during school time on school grounds would violate the Establishment Clause." 37 F.3d 517, 522 (9th Cir.1994). Like *Lee*, the case is inapposite as it involves the entirely different issue of school-sanctioned religious speech which "would have the primary effect of advancing

120 L.Ed.2d 467 (1992) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 678, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)). Here, there is no evidence that the School's actions were based on anything other than an entirely secular and legitimate aim of protecting the rights of students and promoting a tolerant and safe learning environment. There is certainly no evidence (or even allegation) that school authorities sought to coerce or encourage Harper to participate in some other religion or to adopt some state-supported or other religious faith. To reiterate what we explained in the "Free Exercise" section of this opinion, the teaching of secular democratic values does not violate the First Amendment, even if that teaching conflicts in some respect with a sincerely held view that a student or his parents may attribute to the particular religion to which they adhere.

 Government conduct does not violate the Establishment Clause when (1) it has a secular purpose, (2) its principal and primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement in religion. *See Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). For the reasons we have already explained, the record supports the district court's conclusion that the School's actions "had a secular purpose, *i.e.,* promoting tolerance, and not advancing or inhibiting religion." It is also clear from the record that the primary effect of the School's banning of the T-shirt was not to advance or inhibit religion but to protect and preserve the educational environment and the rights of other members of the student body. Nor can there be any question in this case of excessive government entanglement in religion. Finally, as we have already discussed, there is no evidence in the record that school officials attempted

to change Harper's religious beliefs. A fortiori, there is no evidence that they attempted to *coerce* Harper into changing his beliefs. For all the above reasons, we hold that the district court did not abuse its discretion in finding that Harper failed to demonstrate a likelihood of success on the merits of his Establishment Clause claim.

**4. Other Claims**

 In addition to the denial of his preliminary injunction motion, Harper asks that we review the district court's dismissal of his due process and equal protection causes of action, as well as the court's grant of qualified immunity to the individual defendants, under the doctrine of "pendent appellate jurisdiction." We may exercise pendent appellate jurisdiction "over rulings that are inextricably intertwined with or necessary to ensure meaningful review of decisions that are properly before us on interlocutory appeal." *Poulos v. Caesars World, Inc.,* 379 F.3d 654, 668 (9th Cir.2004) (internal quotation marks omitted). In order for pendent issues to be "inextricably intertwined" they must either " '(a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal . . . or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue.' " *Batzel v. Smith,* 333 F.3d 1018, 1023 (9th Cir.2003) (quoting *Cunningham v. Gates,* 229 F.3d 1271, 1285 (9th Cir.2000)).

 With regard to Harper's due process cause of action, it is based on his claim that the School's dress code is impermissibly vague in violation of the Due Process Clause. As we have already explained, *see supra* note 11, we need not

religion, and would entangle the school with religion." *Id.*

consider the validity of the School's dress code in order to rule on the preliminary injunction. As to Harper's equal protection contention, as presented on this appeal it is simply a restatement of his viewpoint discrimination claim which, for the reasons already provided, we have rejected. Whether or not there may be other aspects to the claim we do not know with certainty at this point in the proceedings; thus we do not review that claim here. Accordingly, neither the due process nor equal protection claim is one we must decide in order to resolve the issue before us, and our resolution of the issue before us does not require us to determine the merits of either claim. Whatever the merits of those claims (and we have no cause here to question the district court's decision as to either), their validity or invalidity is of no consequence here. Finally, the district court's dismissal of Harper's damages claims based on a finding of qualified immunity is not "inextricably intertwined" with the denial of the preliminary injunction motion, *Poulos,* 379 F.3d at 668, as we need not "decide the [qualified immunity] issue in order to review the claims properly raised on interlocutory appeal...." *Batzel,* 333 F.3d at 1023 (quoting *Cunningham v. Gates,* 229 F.3d 1271, 1284 (9th Cir.2000)).

## VI. Conclusion

We hold that the district court did not abuse its discretion in denying the preliminary injunction. Harper failed to demonstrate that he will likely prevail on the merits of his free speech, free exercise of religion, or establishment of religion claims. In fact, such future success on Harper's part is highly unlikely, given the legal principles discussed in this opinion. The Free Speech Clause permits public schools to restrict student speech that intrudes upon the rights of other students. Injurious speech that may be so limited is not immune from regulation simply be-

cause it reflects the speaker's religious views. Accordingly, we affirm the district court's denial of Harper's motion for a preliminary injunction.

AFFIRMED; REMANDED for further proceedings consistent with this opinion.

### *Exhibit A*

### Exhibit A

KOZINSKI, Circuit Judge, dissenting:

While I find this a difficult and troubling case, I can agree with neither the majority's rationale nor its conclusion. On the record to date, the school authorities have offered no lawful justification for banning Harper's t-shirt and the district court should therefore have enjoined them from doing so pending the outcome of this case. Harper, moreover, raised a valid facial challenge to the school's harassment policy, and the district court should have enjoined the policy as well.

#### The T-shirt

As the majority correctly notes, school speech falls into three categories, each governed by its own standard. The first category involves school-sponsored speech, which is governed by *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 270–71, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). The second involves vulgar or plainly offensive speech, and it is governed by *Bethel School District No. 403 v. Fraser,* 478

U.S. 675, 683–85, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). All other speech falls into the third category and is governed by *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 511–14, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

Harper's t-shirt was clearly not school sponsored, so the *Hazelwood* standard—highly deferential to school authorities—does not apply. Until recently, it was a closer question whether Harper's t-shirt involved plainly offensive speech, which may be banned by the school under *Fraser.* See *Scott v. School Bd. of Alachua County,* 324 F.3d 1246, 1249 (11th Cir. 2003) (per curiam) (upholding ban on Confederate flag under both *Tinker* and *Fraser*). But our recent opinion in *Frederick v. Morse,* 439 F.3d 1114 (9th Cir.2006), puts this issue to rest, explaining that "plainly offensive" under *Fraser* is determined by the language used, not the idea conveyed. *See id.* at 1119–21. Since there was nothing offensive about the *language* of Harper's t-shirt, the school authorities here cannot rely on *Fraser.*[1]

If the school's ban of the shirt is to be upheld, then, it must be because it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Tinker,* 393 U.S. at 513, 89 S.Ct. 733.

1. School authorities may ban student speech based on the existence of "any facts which might reasonably [lead] school authorities to forecast substantial disruption." *Id.* at 514, 89 S.Ct. 733. While we do not require school officials to be certain that disruption will occur, *see LaVine v. Blaine Sch. Dist.,* 257 F.3d 981, 989 (9th Cir.2001), they must present "evidence that [the ban] is necessary to avoid *material* and *substantial* interference with schoolwork or discipline." *Tinker,* 393 U.S. at 511, 89 S.Ct. 733 (emphasis added).

The school authorities here have shown precious little to support an inference that Harper's t-shirt would "materially disrupt[ ] classwork." One teacher, David LeMaster, said that several students in class were "off-task talking about [the] content of 'Chase's shirt' when they should have been working." LeMaster decl. at 2. Surely, however, it is not unusual in a high school classroom for students to be "off-task." The scène à faire of high school students bored or distracted in class is a

---

1. Reconciling *Tinker* and *Fraser* is no easy task. The Supreme Court majority in *Fraser* seems to have been influenced by the indecorousness of Fraser's comments, which referred to a fellow student in terms that could be understood as a thinly-veiled phallic metaphor. *See Fraser,* 478 U.S. at 687, 106 S.Ct. 3159 (Brennan, J., concurring) (quoting Fraser's comments). The curious thing, though, is that Fraser used no dirty *words,* so his speech could only have been offensive on account of the ideas he conveyed—the ideas embodied in his elaborate double-entendre. So construed, however, *Fraser* swallows up *Tinker,* by suggesting that some ideas can be excluded from the high school environment, even if they don't meet the *Tinker* standard. *Fraser* might also be read as dealing with the situation involving a captive audience because the speech was given at a school sponsored assembly. However, attendance at the assembly was merely expected, not required, so students were perfectly free not to listen to the offensive speech. *See Fraser,* 478 U.S. at 677, 106 S.Ct. 3159. Then, again, how were students to know that they would hear a sexually offensive speech when they attended an assembly designed to debate the merits of candidates for student political office? Perhaps *Fraser* is best read as dealing with the situation where the school sponsors the activity in question and invites or encourages students to attend. By giving its imprimatur to the activity, the school is, in effect, assuring potential attendees that they will not be subjected to anything plainly offensive. So read, *Fraser* is merely a precursor to *Hazelwood,* and has no application at all to speech that has no school sponsorship at all—like talk in the corridors or messages on t-shirts worn by students.

cliché.[2] LeMaster gives no indication that the distracted students refused to get back on task once they were admonished, or that the t-shirt caused a commotion or otherwise materially interfered with class activities. As this is the *only* evidence that Harper's t-shirt interfered with classroom learning, I find it ludicrously weak support for banning Harper's t-shirt on the ground that it would "materially disrupt[ ] classwork." *Tinker*, 393 U.S. at 513, 89 S.Ct. 733.

The remaining two pieces of evidence presented by the defendants do not involve disruption of classwork, and thus must be judged by the "substantial disorder" standard. *Id.* School authorities have far less latitude to ban speech that does not interfere with learning situations. Between classes, students are free—indeed encouraged—to engage in discussions that are not strictly school related. Politics, sports, movies, music and personal matters are the ordinary subjects of discourse in high school corridors and lunch rooms.[3] Occasionally such discussions can become heated, but so long as they don't escalate into violence or the threat of violence, and do not otherwise interfere with school operations, they cause no disruption of the school environment.

Defendants point to Harper's own report that "he [had been] involved in a tense verbal conversation with a group of students" earlier that day, but this is hardly the stuff of which substantial disorder is made. Fisher decl. at 3. People—judges even—often have strong views and their discussions will naturally reflect this intensity of feeling. There is nothing at all

wrong with that, and it normally does not lead to substantial disorder. There is no indication that Harper's discussion turned violent or disrupted school activities. There is no evidence that it involved shouting or threats, or that it interfered with the passage of students to and from class. The discussion, tense though it may have been, did not have to be broken up by school authorities; rather, it seems to have come to a peaceful conclusion. The best proof that this "tense verbal conversation" did not cause substantial disorder is that the school authorities knew nothing about the incident until Harper himself reported it. The only thing one can infer from this evidence is that, whatever strong feelings Harper's t-shirt may have aroused, it did *not* cause any disruption of school activities, substantial or otherwise.

The second piece of evidence on which the school authorities rely doesn't involve Harper at all. It consists of surprisingly vague references to some incidents that had occurred a year earlier, "during the days surrounding the Day of Silence between certain gay and straight students." Fisher decl. at 3. Poway High School Principal Scott E. Fisher describes the situation as follows: "For example, an altercation had occurred which required me to physically separate the students. Those students were disciplined for their actions." *Id.* Assistant Principal Lynell Antrim has the following description:

> The previous year, in April, 2003, the Day [of Silence] brought some volatile behavior between students, and there was an unsanctioned Straight–Pride Day a week or so later. No club organized

---

2. *See, e.g., Ferris Bueller's Day Off* (Paramount Pictures 1986); J.K. Rowling, *Harry Potter and the Half–Blood Prince* (2005); *Buffy the Vampire Slayer; Beverly Hills 90210; The O.C.; Saved by the Bell; Veronica Mars;* and zillions more.

3. This theme too has been mined by screenwriters ad nauseam. *See, e.g., The Breakfast Club* (Universal Pictures 1985); *Clueless* (Paramount Pictures 1995); *10 Things I Hate About You* (Touchstone Pictures 1999); *Mean Girls* (Paramount Pictures 2004); *Saved!* (United Artists Pictures 2004).

that Straight Pride Day, but there were store-printed shirts with inflammatory messages and some hand-scripted T-shirts with derogatory remarks. Some students last year were asked to remove the shirts and did so. Other students had an altercation and were suspended for their actions.

Antrim decl. at 2. Finally, Assistant Principal Edward L. Giles explains as follows:

I told Ron Harper [Chase's dad] of our concern for the safety of our students when they altered their clothes to carry messages that could be inflammatory or demeaning. I told him we had some situations in the past of physical altercations because someone took exception to a message concerning sexual orientation on another person. I explained to him we did not want messages that carried with them a negative tone.

Giles decl. at 4.

Evidence that derogatory messages on t-shirts had resulted in physical altercations between students in the past certainly could be relevant in determining whether Harper's message would be likely to cause such disruption in the future. Unfortunately, however, it is not clear from these declarations that the messages on the t-shirts were in any way involved in the previous year's altercation; Antrim's declaration seems to say that the students involved in the altercation were *different* from the students who wore the t-shirts. Only Giles suggests a connection between the t-shirts and the altercations, and then somewhat obliquely.[4] More importantly, we are not told how closely the messages in the previous year mirrored that on Harper's t-shirt. For all we know, the previous year's t-shirts contained invective, profanity or epithets; they may have called for violence against homosexuals. Nor do we know whether the altercations in question were caused by the t-shirts alone, or by a combination of the t-shirts and oral taunts by those wearing the shirts or by those who opposed them. In short, without knowing a great deal more about the situation in the previous year—information the school authorities surely had available and could have put into the record—I cannot say that defendants reasonably concluded that Harper's wearing of *this* t-shirt was likely to cause substantial disruption.[5]

There is, in fact, persuasive evidence that it would not. I have already mentioned the apparently peaceful confrontation Harper had with other students that very day; while words were exchanged, the students managed the situation well and without intervention from the school authorities. No doubt, everyone learned an important civics lesson about dealing with others who hold sharply divergent views. Moreover, Harper wore a t-shirt

---

4. Giles, it will be noted, is swearing only that this is what he told Ron Harper; he is not swearing this is, in fact, what had happened the previous year. It's possible that Giles's statement to Harper was exaggerated or tailored to help defuse the situation. As Giles was not then under oath, a little stretching of the truth to jolly along an angry parent might have been perfectly okay. However, when this statement is imported into the litigation as hearsay, I'm not sure we are bound to believe anything more than this is what Giles told Harper.

5. I must also mention the incongruity of prohibiting speech because others respond to it with violence. Assuming that someone in the previous year wore a t-shirt similar to Harper's, and was physically attacked "because someone took exception to a message concerning sexual orientation," Giles decl. at 4, I'm not prepared to say that this alone would be sufficient to ban the shirt. Maybe the right response is to expel students who attack other students on school premises. *But see Karp v. Becken,* 477 F.2d 171, 173, 175–76 (9th Cir. 1973) (upholding confiscation of protest banners based on a variety of factors, including threats of violence by other students).

with substantially the same message the entire previous day, yet there was no disruption. *See* maj. op. at 1171. While I agree that school officials need not wait for students to come to blows, their determination of likely disruption must be reasonable. On this record, I cannot find that it was.

But there is a more fundamental issue here. The record reveals quite clearly that Harper's t-shirt was not an out-of-the-blue affront to fellow students who were minding their own business. Rather, Harper wore his t-shirt in response to the Day of Silence, a political activity that was sponsored or at the very least tolerated by school authorities.[6] The Day of Silence is a protest sponsored by the Gay, Lesbian and Straight Education Network (GLSEN). According to a GLSEN press release, the Day of Silence is "an annual, national student-led effort in which participants take a vow of silence to peacefully protest the discrimination and harassment faced by lesbian, gay, bisexual and transgender (LGBT) youth in schools." Press Release, GLSEN, *A New Record for the Day of Silence* (Apr. 14, 2004), *available at* http://www.glsen.org/cgi-bin/iowa/all/news/record/1655.html. The point of this protest, as I understand it, is to promote tolerance toward all students, regardless of their sexual orientation. *See* Antrim decl. at 2.

Tolerance is a civic virtue,[7] but not one practiced by all members of our society toward all others. This may be unfortunate, but it is a reality we must accept in a pluralistic society.[8] Specifically, tolerance toward homosexuality and homosexual conduct is anathema to those who believe that intimate relations among people of the same sex are immoral or sinful. So long as the subject is kept out of the school environment, these differences of opinion need not clash. But a visible and highly publicized political action by those on one side of the issue will provoke those on the other side to express a different point of view, if only to avoid the implication that they agree. *See* Robert Bolt, *A Man for All Seasons* act 2, at 88 (1962) ("The maxim of the law is 'Silence gives consent.' ").

6. Assistant Principal Antrim in her declaration refers to the Straight–Pride Day the previous year as "unsanctioned," suggesting a contrast with the Day of Silence. The school authorities have a close working relationship with the Gay–Straight Alliance (GSA), the campus club that sponsors the Day of Silence. After last year's "tension" over the Day of Silence, the principal and the associated student body director worked with the GSA throughout the year to set "clearer guidelines" for this year's Day of Silence, and to "problem solve" tension among students about these issues. Antrim decl. at 2.

7. The majority waxes eloquent about the right of schools "to teach civic responsibility and tolerance as part of its basic educational mission," while suppressing other points of view. Maj. op. at 1185. But one man's civic responsibility is another man's thought control. For example, respect for the Constitution and support for the military are commonly regarded as civic virtues. But laws requiring schools receiving federal funding to hold a Constitution Day or to give military recruiters the names, addresses and phone numbers of their students have proved quite controversial. *See* Consolidated Appropriations Act, 2005, Pub.L. No. 108–447, § 111(b), 118 Stat. 2809, 3344 (2004); 20 U.S.C. § 7908; *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, —— U.S. ——, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). Having public schools, and those who fund them, define civic responsibility and then ban opposing points of view, as the majority seems willing to do, may be an invitation to group-think.

8. Indeed, tolerance may not always be a virtue. Tolerating wicked conduct, bigotry or malicious gossip, for example, may not be in the least commendable. Then there is the question of whether we should tolerate intolerance, a question as imponderable as a Möbius strip. Whether tolerance is a good or a bad thing may turn on what we think about the thing being tolerated.

Given the history of violent confrontation between those who support the Day of Silence and those who oppose it, the school authorities may have been justified in banning the subject altogether by denying both sides permission to express their views during the school day. *See, e.g., West v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358, 1361, 1366 (10th Cir.2000) (upholding ban on items that give rise to racial tension such as Confederate flags and Malcolm X t-shirts). I find it far more problematic—and more than a little ironic—to try to solve the problem of violent confrontations by gagging only those who oppose the Day of Silence and the point of view it represents. Or, as Judge Rosen put it in *Hansen v. Ann Arbor Public Schools,* 293 F.Supp.2d 780 (E.D.Mich. 2003), "[t]hat Defendants can say with apparent sincerity that they were advancing the goal of promoting 'acceptance and tolerance for minority points of view' by their demonstrated *in*tolerance for a viewpoint that was not consistent with their own is hardly worthy of serious comment." *Id.* at 801–02.

I cannot imagine that my colleagues would approve this in other situations. Say, for example, one school group—perhaps the Young Republicans—were to organize a day of support for the war in Iraq by encouraging students to wear a yellow armband. And suppose that other students responded by wearing t-shirts with messages such as "Marines are Murderers" and "U.S. Bombs Kill Babies." If a student whose brother was killed in Iraq assaulted a student wearing one of the anti-war t-shirts, would we approve a school's response that banned the t-shirts but continued to permit the yellow armbands? *See R.A.V. v. City of Saint Paul,* 505 U.S. 377, 392, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("[The government] has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensber-

ry rules."). Not to worry, says the majority, because students can still sport t-shirts that criticize "the President, his administration, or his policies, or otherwise invite political disagreement or debate." Maj. op. at 1182. But acceptance of homosexuality *is* a political disagreement and debate. It's not at all clear to me how one can criticize public officers and their policies without also addressing the controversial policies they adopt. For example, in 2004, San Francisco mayor Gavin Newsom issued marriage licenses to nearly 4,000 gay and lesbian couples. While some people view this as a courageous and principled action, others consider it an abomination. It's not at all clear to me how those in the latter camp could go about expressing their vehement disagreement with Mayor Newsom's policy without also expressing disdain for those who turned out at City Hall to take advantage of the policy.

Of the possible measures a school might take to deal with substantial disruption of the school environment, those involving viewpoint discrimination would seem to me to be the least justifiable. To quote Judge Rosen once again, "no matter how well-intentioned the stated objective, once schools get into the business of actively promoting one political or religious viewpoint over another, there is no end to the mischief that can be done in the name of good intentions." *Hansen,* 293 F.Supp.2d at 803.

2. *Tinker* does contain an additional ground for banning student speech, namely where it is an "invasion of the rights of others." 393 U.S. at 513, 89 S.Ct. 733. The school authorities suggest that Harper's t-shirt violates California Education Code § 201(a), which provides that "[a]ll pupils have the right to participate fully in the educational process, free from discrimination and harassment." Defendants cite

no California case holding that the passive display by one student of a message another student finds offensive violates this provision, and I am reluctant to so conclude on my own. The interaction between harassment law and the First Amendment is a difficult and unsettled one because much of what harassment law seeks to prohibit, the First Amendment seems to protect. *See Saxe v. State Coll. Area Sch. Dist.,* 240 F.3d 200, 206–10 & n. 6 (3d Cir.2001). Certainly, state law cannot trump the First Amendment by defining "harassment" as any conduct that another person finds offensive; far too much core First Amendment speech could thus be squelched. *See* Eugene Volokh, Comment, *Freedom of Speech and Workplace Harassment,* 39 UCLA L.Rev. 1791 (1992), *available at* http://www1.law.ucla.edu/̄volokh/harass/substanc.htm in updated form.

Harassment law might be reconcilable with the First Amendment, if it is limited to situations where the speech is so severe and pervasive as to be tantamount to conduct. *See Saxe,* 240 F.3d at 204–10. I need not consider whether section 201(a) is susceptible to such a narrowing construction because it is quite clear that Harper's lone message was not sufficiently severe and pervasive to meet the standard articulated in *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Rather, it seems more like the "simple acts of teasing and name-calling," described by the Supreme Court as non-actionable in *Davis v. Monroe County Board of Education,* 526 U.S. 629, 652, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The "rights of others" language in

*Tinker* can only refer to traditional rights, such as those against assault, defamation, invasion of privacy, extortion and blackmail, whose interplay with the First Amendment is well established. Surely, this language is not meant to give state legislatures the power to define the First Amendment rights of students out of existence by giving others the right not to hear that speech.[9] Otherwise, a state legislature could effectively overrule *Tinker* by granting students an affirmative right not to be offended. To the extent that state law purports to prohibit such language in the school context, it is patently unconstitutional.

Nor can I join my colleagues in concluding that Harper's t-shirt violated the rights of other students by disparaging their homosexual status. As I understand the opinion, my colleagues are saying that messages such as Harper's are so offensive and demeaning that they interfere with the ability of homosexual students to partake of the educational environment. This is not a position briefed or argued by any of the parties, and no one introduced any evidence in support of, or opposition to, this proposition. The school authorities did not try to justify their actions on this ground; instead, they argued that they can ban any t-shirt derogatory to another individual, a proposition that the majority rejects. *See* maj. op. at 1182.

Such sua sponte lawmaking raises many problems, the first of which is that it finds no support in the record. What my colleagues say could be true, but the only support they provide are a few law review

---

9. It is clear, moreover, that the California legislature did not intend to make inroads into the speech rights of students, since California Education Code § 48950(a) gives students *greater* speech rights than they have under federal law. While Harper waived reliance on this section as an independent source of authority for his appeal, *see* maj. op. at

1176 n. 13, we can certainly consider it in deciding how to construe other provisions of California law. Given the broad sweep of section 48950(a), it is simply not tenable to claim, as the majority seems to, that California Education Code sections 200 and 201 limit student speech under the "rights of others" prong of *Tinker.*

articles, a couple of press releases by advocacy groups and some pop psychology. Aside from the fact that published articles are hardly an adequate substitute for record evidence, the cited materials are just not specific enough to be particularly helpful. None would seem to meet the standard of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

The first article, written by physicians but apparently not peer-reviewed, makes a general statement to the effect that academic under-achievement and other problems of homosexual youths "are the probable consequence of violence and verbal and physical abuse at school." Susanne M. Stronski Huwiler & Gary Remafedi, *Adolescent Homosexuality,* 33 Rev. Jur. U.I.P.R. 151, 164 (1999). The article does not explain what the authors mean by "verbal ... abuse," so it's not clear that Harper's t-shirt is even covered by the article's findings. Nor does the article explain the degree to which statements, as opposed to physical abuse, are responsible for the ill effects it discusses. The second article, written by a lawyer, not a healthcare professional, merely points to general problems suffered by gay and lesbian youths during their school years—problems that are reinforced by a variety of school practices and policies. *See* Thomas A. Mayes, *Confronting Same–Sex, Student–to–Student Sexual Harassment: Recommendations for Educators and Policy Makers,* 29 Fordham Urb. L.J. 641, 655–58 (2001). The other articles the majority cites also focus on physical abuse or threats, which the school can and should stamp out in a viewpoint neutral way. *See* Amy Lovell, *"Other Students Always Used to Say, 'Look At The Dykes' ": Protecting Students From Peer Sexual Orientation Harassment,* 86 Cal. L.Rev. 617, 625–28 (1998); Courtney Weiner, Note, *Sex Education: Recognizing Anti–Gay Harassment as Sex Discrimination Under Title VII and Title IX,* 37 Colum. Hum. Rts. L.Rev. 189, 221–25 (2005); Kelli Kristine Armstrong, *The Silent Minority Within a Minority: Focusing on the Needs of Gay Youth in Our Public Schools,* 24 Golden Gate U.L.Rev. 67, 76–77 (1994). The majority finally resorts to press releases from advocacy groups—hardly a source "whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). What the materials the majority cites do establish is that the success of gay and lesbian teens in school is a complicated phenomenon, influenced by many factors. Even taking the sources on their own terms, none provides support for the notion that disparaging statements by other students, in the context of a political debate, materially interfere with the ability of homosexual students to profit from the school environment.

Nor do I find the proposition at the heart of the majority's opinion—that homosexual students are severely harmed by any and all statements casting aspersions on their sexual orientation—so self-evident as to require no evidentiary support. We take judicial notice of facts that aren't reasonably subject to dispute—gravity, the temperature at which ice melts, that commercial goods cost money, that time flows forward but not backward. But the fact that we can take judicial notice of certain indisputable facts does not mean that *all* facts are indisputable. Predicting the effect of certain kinds of statements on the learning ability of high school students is simply not the kind of "fact" that is judicially noticeable under any fair reading of Federal Rule of Evidence 201. Even the articles that the majority cites admit that the research on these effects is not unanimous. *See, e.g.,* Lovell, 86 Cal. L.Rev. at 623–24. We have no business assuming without proof that the educational progress of homosexual students would be stunted by Harper's statement.

I find it significant, moreover, that Harper did not thrust his view of homosexuality into the school environment as part of a campaign to demean or embarrass other students. Rather, he was responding to public statements made by others with whom he disagreed. Whatever one might think are the psychological effects of unprovoked demeaning statements by one student against another, the effects may be quite different when they are part of a political give-and-take. By participating in the Day of Silence activities, homosexual students perforce acknowledge that their status is not universally admired or accepted; the whole point of the Day of Silence, as I understand it, is to dispute views like those characterized by Harper's t-shirt. Supporters of the Day of Silence may prefer to see views such as Harper's chan-

neled into public discourse rather than officially suppressed but whispered behind backs or scribbled on bathroom walls. Confronting—and refuting—such views in a public forum may well empower homosexual students, contributing to their sense of self-esteem.

Beyond the question of evidentiary support, I have considerable difficulty understanding the source and sweep of the novel doctrine the majority announces today.[10] Not all statements that demean other students can be banned by schools; the majority is very clear about this. *See* maj. op. at 1181–1182 & n. 27. The new doctrine applies only to statements that demean students based on their "minority status such as race, religion, and sexual orientation." *Id.* at 1182–83.[11] Is

---

**10.** The majority makes a tepid effort to rely on cases from other circuits, but those cases provide virtually no support. *West* did not purport to announce a generalized right to be left alone that includes the right not to hear viewpoints one finds uncomfortable. *See West,* 206 F.3d at 1366. The school board in *West* confronted a long history of racial strife and banned certain political symbols on *both* sides of the controversy. *See id.* at 1361–63. *West* was not a case about psychic damage but about physical security, and whatever stray comments the majority today has plucked out of *West* are more in the nature of loose language than a holding, or even dicta. *Sypniewski v. Warren Hills Regional Board of Education,* 307 F.3d 243 (3d Cir.2002), on which the majority also relies, involved a school district with a history of racial strife. Even there, the court upheld the policy prohibiting racial "abuse and intimidat[ion]" only insofar as it amounted to bullying. *Id.* at 264. It emphasized, however, that mere name-calling is protected, and found the policy overbroad insofar as the statements in question merely generated ill will against a student on account of race: "But by itself, an idea's generating ill will is not a sufficient basis for suppressing its expression. 'The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected.'" *Id.* at 264–65 (quoting *R.A.V.,* 505 U.S. at 414, 112 S.Ct. 2538). Finally, *Saxe,* which the majority dismisses in a brief footnote, *see* maj. op. at

1179–80 n. 21, cuts entirely the other way, for reasons I explain elsewhere, *see* pp. 1205–1206 *infra.*

**11.** The majority equivocates a bit on this point. At one place it states that "[p]ublic school students who may be injured by verbal assaults on the basis of a core identifying characteristic such as race, religion, or sexual orientation, have a right to be free from such attacks while on school campuses." *Id.* at 1178. The majority also does not "exclude ... the possibility that some verbal assaults on the core characteristics of majority high school students would merit application of the *Tinker* 'intrusion upon the rights of other students' prong." *Id.* at 1183 n.28. Read broadly, this would protect students from being disparaged based on any characteristic that two of my colleagues consider to be "core." Presumably this could include race, nationality, sex, weight class, hair color and religion—but not political affiliation. *See id.* at 1182. Next, the majority notes that "schools may prohibit the wearing of T-shirts on high school campuses and in high school classes that flaunt demeaning slogans, phrases or aphorisms relating to a core characteristic of *particularly vulnerable* students and that may cause them significant injury." *Id.* at 1182 (emphasis added). Later on, however, the opinion limits the new doctrine to core minority characteristics. *See id.* at 1182 n. 27. I read the majority's last formulation to be the one it intends, else my colleagues would pretty much have ripped the heart out of *Tinker.*

this a right created by state law? By federal law? By common law? And if interference with the learning process is the keystone to the new right, how come it's limited to those characteristics that are associated with minority status? Students may well have their self-esteem bruised by being demeaned for being white or Christian, or having bad acne or weight problems, or being poor or stupid or any one of the infinite number of characteristics that will not qualify them for minority status. Under the rule the majority announces today, schools would be able to ban t-shirts with pictures of Mohammed wearing a bomb turban but not those with pictures of a Crucifix dipped in urine—yet Muslim and Christian children, respectively, may have their learning equally disrupted.

Even the concept of minority status is not free from doubt. In defining what is a minority—and hence protected—do we look to the national community, the state, the locality or the school? In a school that has 60 percent black students and 40 percent white students, will the school be able to ban t-shirts with anti-black racist messages but not those with anti-white racist messages, or vice versa? Must a Salt Lake City high school prohibit or permit *Big Love* t-shirts?

And at what level of generality do we define a minority group? If the Pope speaks out against gay marriage, can gay students wear to school t-shirts saying "Catholics Are Bigots," or will they be demeaning the core characteristic of a religious minority? And, are Catholics part of a monolithic Christian majority, or a minority sect that has endured centuries of discrimination in America? *See* maj. op. at 1181 n. 26.

Finally, I have considerable difficulty with giving school authorities the power to decide that only one side of a controversial topic may be discussed in the school environment because the opposing point of view is too extreme or demeaning. As Judge Gilman said in his persuasive dissent in *Boroff v. Van Wert City Board of Education,* 220 F.3d 465 (6th Cir.2000), "school officials are not free to decide that only one side of a topic is open for discussion because the other side is too repugnant or demoralizing to listen to." *Id.* at 474 (Gilman, J., dissenting) (citing *Tinker,* 393 U.S. at 508, 89 S.Ct. 733). I couldn't have said it better.

The fundamental problem with the majority's approach is that it has no anchor anywhere in the record or in the law. It is entirely a judicial creation, hatched to deal with the situation before us, but likely to cause innumerable problems in the future. Respectfully, I cannot go along.

### The Harassment Policy

I believe we must also address Harper's claim that he is entitled to an injunction against the school's harassment policy on grounds of substantial overbreadth. Harper raised this claim in the district court, *see* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction at 14–16, but the district judge did not decide it in his otherwise thorough opinion. Harper again raises this claim in his brief before us, and the defendants respond in their brief, yet the majority also fails to decide it. The majority suggests in a footnote that it need not consider whether the school's harassment policy is overbroad because it upholds the school's banning of Harper's t-shirt regardless of the policy. Maj. op. at 1175 n. 11. The policy, however, covers much more than the particular t-shirt Harper wore on the day in question. Given that the majority has effectively upheld the school's banning of that shirt, it becomes even more important for us to rule on whether and how Harper may express his

views in the future.[12] To the extent that the harassment policy limits the ways in which Harper may express himself by means *other* than his t-shirt, he is surely entitled to a ruling as to whether the district court erred in failing to enjoin the policy.

1. The school's harassment policy is contained in several documents. One of these is titled "Student Guide to Understanding and Avoiding Harassment" and contains a list of "actions [that] are prohibited for both students and staff." One such prohibited item is "[n]egative comments or behavior based on race, ethnicity, sexual orientation, religion, or gender." Another publication, addressed to parents, titled "Poway Unified School District Policies & Procedures for Parents Concerning Harassment of Students" contains the following admonition: "SPECIFIC HARASSMENT BEHAVIORS THAT ARE NOT TOLERATED IN THE *POWAY UNIFIED SCHOOL DISTRICT* INCLUDE," which is followed by a number of items, among them "[n]egative comments, slurs, or behaviors based on race, ethnicity, sexual orientation, religion, or gender."

A document titled "Poway Unified School District Administrative Procedure," dated July 28, 1997, and subtitled "Hate Behavior," contains the following definition:

> A hate behavior is any act or attempted act to cause physical injury, emotional suffering, or property damage through intimidation, harassment, racial/ethnic slurs and bigoted epithets, vandalism, force or the threat of force, motivated all or in part by hostility to the victim's real or perceived gender, race, ethnicity, religion, sexual orientation, or mental or physical challenges.

The same document contains a heading titled "Examples of Hate Behavior," which is followed by a "list provid[ing] examples of hate behavior to assist identifying where and when it may exist." Among the items listed are the following:

2. The presence of symbols or words considered offensive to persons of a specific gender, race, ethnicity, religion, sexual orientation, or the mentally or physically challenged, such as graffiti, slurs, or painted swastikas.

3. Activities historically associated with threats to persons of a specific gender, race, ethnicity, religion, sexual orientation, or the mentally or physically challenged (e.g., burning crosses, wearing swastikas or white sheets, flying confederate flags,

---

**12.** The majority also seems to say that Harper limited his prayer for relief to the wearing of the shirt, but this is plainly not so. In his motion for a preliminary injunction, Harper moves the district court

> for a preliminary injunction prohibiting Defendants from continuing their violation of the constitutional rights of Plaintiff Tyler Chase Harper. Unless such injunction issues, Chase will continue to suffer irreparable harm to his free speech right to speak out on matters at school in a nondisruptive manner, even if they are perceived by others as "negative" or "derogatory."

Plaintiffs' Notice of and Motion for Preliminary Injunction at 3.

In his Memorandum of Points and Authorities in Support of the Motion, Harper expressly challenges the school's Harassment Policy as a whole on overbreadth grounds. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction 14–16.

Finally, the majority declines to address the overbreadth argument on the ground that the district judge didn't believe it was before him. *See* maj. op. at 1175 n. 11. But if Harper properly presented the issue—and I have no doubt he did—he is entitled to a ruling, even if we have to address the issue in the first instance. Were a district judge's failure to rule on an issue dispositive, district judges could bury a party's claims simply by ignoring them.

hanging effigies, defacing pink triangles).

. . . .

6. Victim belief that the incident was motivated by bias against him/her as a member of a specific gender, race, ethnicity, religion, sexual orientation, or mentally or physically challenged group.

7. Perpetrator explanation/defense of incident involves exalting own gender, race, ethnicity, religion, sexual orientation, or mental or physical status and/or includes statements demeaning victim group.

Finally, the lengthy Poway High School Student Handbook contains detailed regulations as to every aspect of student life. Among the many items listed is a dress code:

Dress: School clothing should be neat, clean, and appropriate for school activities and should follow the standards of common decency. The dress code will be enforced at all school-sponsored activities. Clothing that violates this standard is unacceptable, and the student in violation will be disciplined appropriately.

Examples of unacceptable dress include "[c]lothing and accessories (including backpacks) that promote or portray ... [v]iolence or hate behavior including derogatory connotations directed toward sexual identity."

Under the heading "Rules of Student Discipline," there is a long list of prohibited acts, including "Sexual harassment" and "Hate behavior/Violence." The list is both preceded and followed with the admonition that:

A student will be subject to disciplinary action for the designated acts that are related to school activity and attendance and which occur at any time, including but not limited to any of the following:

- The student is on school grounds at a time when school is in session or a school-sponsored activity is in progress
- The student is going to or coming from school
- The student is on break or lunch periods whether on or off campus
- The student is going to, coming from or attending a school-sponsored activity.

Following this list, are a series of definitions, among them the following:

Discrimination: Discrimination is negative or unfair treatment toward an individual based on race, ethnicity, sexual orientation, religion or gender. It is against the rules for students to make nasty remarks that embarrass others or make them feel uncomfortable with actions or remarks that are sexual or racial in nature.

Harassment: Harassment is unwanted and unwelcome behavior from other students or staff members that interferes with another individual's life. When it is sexual in nature, it is "sexual harassment". When it is racial in nature, it is "hate motivated behavior" or sometimes a "hate crime".

Hate Behavior: Negative behaviors that target members of a particular gender, race, ethnicity, religion, sexual orientation, or the mentally or physically challenged will not be tolerated. Such behaviors may include, but are not limited to:

1. Name calling, racial slurs or bigoted epithets.

2. The presence of symbols or words considered offensive to persons of a specific gender, race, ethnicity, religion, sexual orientation or the mentally or physically challenged, such

as graffiti, slurs or painted swastikas.

3. Activities historically associated with threats to persons of a specific gender, race, ethnicity, religion, sexual orientation or the mentally or physically challenged (e.g., burning crosses, wearing swastikas or white sheets, flying confederate flags, hanging effigies, defacing pink triangles).

4. The posting or circulation of demeaning jokes or caricatures, based on negative stereotypes of a specific gender, race, ethnicity, nationality, religion, sexual orientation or mental or physical challenges.

5. The defacing, removal, or destruction of posted materials, meeting places, memorials, etc. associated with specific gender, race, ethnic, religious, sexual orientation or mental or physical challenges.

6. Victim belief that the incident was motivated by bias against him/her as a member of a specific gender, racial, ethnic, religious, sexual orientation or mentally or physically challenged group.

7. Perpetrator explanation/defense of incident involves exalting own gender, race, ethnicity, religion, sexual orientation or mental or physical status and/or includes statements demeaning victim group.

8. The presence of organized hate group literature and/or posters or reference to an organized hate group.

While the parties provide little guidance about how to navigate these not entirely consistent documents, the most plausible way is to treat the two bulletins distributed to parents and students respectively as informal guidance intended to give a summary of the purpose and effect of the formal rules. The Administrative Procedure appears to be internal guidance from the school board to school district employees as to the proper way to interpret the formal rules. It is the Student Handbook—the lengthy and detailed set of regulations applicable to Poway High School—that contains the binding rules, the violation of which may result in discipline. It is to these regulations, then, that we must look in determining the scope of the school's anti-harassment policy; the remaining three documents can serve merely as guidance in interpreting the regulations.

2. The school's harassment policy seems to prohibit any student speech, whether it be in the classroom, elsewhere on campus, in connection with any school activity, going to and returning from school and quite possibly at all other times and places, if it is derogatory, intended to be derogatory or believed to be derogatory of other students based on certain characteristics—race, ethnicity, sexual orientation, religion, sex or disability. The prohibition extends to jokes or caricatures "based on negative stereotypes," wearing of clothing that portrays "derogatory connotations directed toward sexual identity," name-calling, anything that someone who is a member of one of the protected categories believes was directed against him on account of his status, and any statement by the speaker that exalts his own status in comparison to that of others. The Student Guide to Understanding and Avoiding Harassment seems to summarize the policy fairly accurately when it explains that "[n]egative comments or behavior based on race, ethnicity, sexual orientation, religion, or gender" are prohibited. That is pretty much the position taken by Principal Fisher in his declaration: "It is my stance that any shirt which is worn on campus which speaks in a derogatory manner towards an individual or group of individuals is not

healthy for young people and in violation of school policy." Fisher decl. at 3.

So interpreted, the school's harassment policy is substantially overbroad, largely for the reasons articulated by the Third Circuit in *Saxe v. State College Area School District*, 240 F.3d 200 (3d Cir.2001). The policy here, like that in *Saxe*, is not limited to speech that is vulgar, as defined by *Fraser*, or likely to cause substantial disruption under *Tinker*. Also, as in *Saxe*, the policy here is not limited to offensive speech that is severe and pervasive, so that the prohibition might be approved under our emerging harassment law jurisprudence. *See id.* at 217. Rather, the policy prohibits pretty much any speech that any student who is a member of one of the protected groups might take umbrage at.

The policy here is, in fact, much broader than that in *Saxe* in several important respects. First, the policy in *Saxe* seems to have been limited to school premises; the *Saxe* court, at least, treated it as such, noting that if the policy were to cover speech outside of school, it would raise additional constitutional problems. *Id.* at 216 & n. 11. By contrast, the policy here expressly applies outside school premises, extending to off-campus school activities and to travel to and from school. Moreover, the policy expressly states that it may apply elsewhere as well. The policy's vast and uncertain geographic sweep makes it even more important that its substantive terms be narrowed down and precisely defined, consistent with the First Amendment.

Second, the policy in *Saxe* was found to be overbroad because it prohibited not merely speech that was actually disruptive, but also speech that had the purpose of disrupting, regardless of whether actual disruption occurred. *Id.* at 216. The policy here says relatively little about disruption, whether intended or actual. Rather, it prohibits much speech merely because of

its "derogatory connotations" or because it "interferes with another individual's life." Assuming that a person of ordinary intelligence could even understand what these vacuous phrases mean, the policy here covers vastly more territory than permissible under *Tinker*.

Third, the policy in *Saxe* at least attempted to apply some sort of objective definition of what might be deemed offensive or intimidating. *Id.* at 215 ("[H]arassment under the Policy 'can include any unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the characteristics described above.' "). By contrast, the policy here focuses expressly on what the individual who believes himself to be the target of the speech believes was the motivation of the speaker. Given the propensity of individuals, particularly adolescents, to view themselves as the center of the universe, this strikes me as a particularly broad and chilling aspect of the policy. *See Sypniewski*, 307 F.3d at 268–69 ("When policies focus broadly on listeners' reactions, without providing a basis for limiting application to disruptive expression, they are likely to cover a substantial amount of protected speech."). After all, who among us has never made what he thought was an innocuous remark only to learn that somebody else took it as maliciously pointed at them?

Fourth, the policy here, unlike that in *Saxe*, covers much of what lies at the core of political and symbolic speech, such as the presence or defacing of political symbols, hanging of effigies, flying of flags, etc. I do not dispute that a school can ban certain political symbols based on experience indicating that those symbols may lead to serious disruption or violence. *See Sypniewski*, 307 F.3d at 257–58; *West*, 206 F.3d at 1366. But the wholesale banning of the Stars and Bars, swastikas and the

like, without any showing of past disruption or likelihood of future disruption, simply to spare the feelings of students who might be offended by them, strikes me as constitutionally impermissible.[13] As the *Saxe* court noted, "[t]he Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Saxe*, 240 F.3d at 215 (citing cases).

Last but not least, the policy here (unlike that in *Saxe*) prohibits not only speech that denigrates others, but also any speech that the student seeks to justify by expressing pride in his own traits. We are taught to take pride in who we are; it is, in a sense, the American way. It seems particularly chilling to free expression to restrain speech that expresses pride in one's own religion, ethnicity, sexual orientation, etc.

The problems posed by the policy here, not only for Harper but for many other students, are not theoretical or trivial. Assuming, as we must, that on the next Day of Silence Harper will not be allowed to wear a t-shirt expressing his interpretation of Romans 1:27, what exactly *can* he say or wear? Would a t-shirt quoting Romans 1:27[14] be permissible, or is it prohibited because a homosexual student might interpret it as "motivated by bias against him/her"? How about a t-shirt with the message "Straight and Proud of It"? Is this a protected "positive" message, or is it the dreaded "exalting own ...

sexual orientation" and therefore hate behavior? Indeed, is there anything at all that Harper and others of his view can say or do to distance themselves from the Day of Silence proceedings without running the risk that another student will take it personally? May Harper have a discussion at lunchtime where he says: "Homosexuality is sinful"? On his way home from school, may he tell another student a joke disparaging the movie *Brokeback Mountain*? Once he gets home, can he post criticism of the Day of Silence on his MySpace page? Given the broad language of the policy, I believe any and all of these could be punished by the school authorities as hate behavior.

Nor is Harper alone. Consider those who participate in the Day of Silence. They, of course, believe they are doing so to promote tolerance and equality. But others—like Harper—might view it as an effort to exalt homosexuality and denigrate their own sexual orientation and religious beliefs. Relying on the same overbroad policy that the school used to ban Harper's t-shirt, the school could, if it chose, easily ban the Day of Silence activities as demeaning the sexual orientation of straight students, or the religious beliefs of Christians like Harper.

All manner of other speech, from the innocuous to the laudable, could also be banned or punished under the school's hate speech policy. May a student wear a Black Pride t-shirt, or does this denigrate white and Asian students? May a student

---

**13.** There is language in the imprecisely written opinion in *Muller v. Jefferson Lighthouse School*, 98 F.3d 1530 (7th Cir.1996), suggesting that a school could restrict "speech that could crush a child's sense of self-worth." *Id.* at 1539–40. *Muller* involved elementary-school children and probably the best way to read this phrase is as adapting the *Tinker–Fraser* standard to younger children. Only Judge Rovner's concurrence is entirely clear

on this point. *Id.* at 1546–47 (Rovner, J., concurring).

**14.** "And likewise also the men, leaving the natural use of the woman, burned in their lust one toward another; men with men working that which is unseemly, and receiving in themselves that recompence of their error which was meet." Romans 1:27 (King James).

wear a t-shirt saying "I love Jesus," or will this make Jews, Muslims and Druids feel it's an attack on their religions? May a student wear a t-shirt saying "Proud to be a Turk," or will this cause bad vibrations for the Greeks and Armenians in the school? Will a student be disciplined for disruption if, during a lunch-time discussion, he argues forcefully that the State of Israel oppresses Palestinians and, when called on it, defends himself, saying: "I said it because I'm proud to be a Muslim."?

The types of speech that could be banned by the school authorities under the Poway High School hate policy are practically without limit. Any speech code that has at its heart avoiding offense to others gives anyone with a thin skin a heckler's veto—something the Supreme Court has not approved in the past. *See, e.g., Reno v. ACLU,* 521 U.S. 844, 880, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); *Hustler Magazine v. Falwell,* 485 U.S. 46, 55–56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). If the policy in *Saxe* was enjoined as overbroad, the policy here must be enjoined as well.[15]

### Conclusion

Because the *only* disputed issue before us is likelihood of success on the merits, I believe we have no choice but to reverse. I think it is highly likely that Harper will succeed on his t-shirt claim, and I have no doubt he will succeed as to his overbreadth challenge.

That having been said, I acknowledge that the school authorities here found themselves in a difficult situation and, in light of the circumstances, acted well. Harper was not disciplined for wearing his t-shirt; the school authorities merely tried to defuse what they saw as a volatile situation.

I also have sympathy for defendants' position that students in school are a captive audience and should not be forced to endure speech that they find offensive and demeaning. There is surely something to the notion that a Jewish student might not be able to devote his full attention to school activities if the fellow in the seat next to him is wearing a t-shirt with the message "Hitler Had the Right Idea" in front and "Let's Finish the Job!" on the back. This t-shirt may well interfere with the educational experience even if the two students never come to blows or even have words about it.

Perhaps school authorities should have greater latitude to control student speech than allowed them by Justice Fortas's Vietnam-era opinion in *Tinker.* Perhaps Justice Black's concerns, expressed in his *Tinker* dissent, *see Tinker,* 393 U.S. at 524–26, 89 S.Ct. 733 (Black, J., dissenting), should have been given more weight, *see Karp,* 477 F.2d at 174. Perhaps the narrow exceptions of *Tinker* should be broadened and multiplied. Perhaps *Tinker* should be overruled. But that is a job for the Supreme Court, not for us. *See Boroff,* 220 F.3d at 475 (Gilman, J., dissenting). While I sympathize with my colleagues' effort to tinker with the law in this area, I am not convinced we have the authority to do so, which is why I must respectfully dissent.

---

**15.** Insofar as *West v. Derby Unified School District No. 260* reaches a contrary conclusion on this issue—as I'm afraid it probably does,

see 206 F.3d at 1367–68—I must respectfully disagree with my Tenth Circuit colleagues.